[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 4, 2011
JOHN LEY
CLERK

_____

No. 10-11848

_____

D.C. Docket No. 8:93-cv-01169-SDN-EAJ

MILO A. ROSE,

Petitioner - Appellant,

versus

WALTER A. MCNEIL,
Secretary, Florida Department of Corrections,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 4, 2011)

Before CARNES, HULL and MARTIN, Circuit Judges.

HULL, Circuit Judge:

Milo A. Rose, a Florida prison inmate under a death sentence, appeals the

district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus.

The sole issue on appeal is whether Rose's trial counsel was ineffective in the investigation and presentation of mitigation evidence at the penalty phase. After review and oral argument, we affirm.

## I.  BACKGROUND

Rose was convicted and sentenced to death for the brutal murder of Robert C. "Butch" Richardson, the son of Rose's girlfriend. Multiple witnesses saw Rose kill Richardson by repeatedly smashing his head with a concrete block. Rose admitted to two acquaintances that he killed Richardson.[1] Rose was arrested the day after Richardson's October 18, 1982 murder.

### A.  Appointment of Counsel

Assistant public defenders Wayne Shipp and Ronald Eide initially represented Rose. In January 1983, Rose moved pro se to dismiss Shipp and Eide, who then moved to withdraw. The state trial court granted their motion. Two different private attorneys then represented Rose, but each withdrew after a few weeks. On March 31, 1983, the state trial court appointed attorney Darryl Rouson,

---

[1]As to Rose's guilt, it is noteworthy that in 2002, the state trial court granted Rose's motion for DNA testing. After the tests results were provided to the parties, Rose made a pro se motion to waive DNA testing, which the state court denied as moot. According to the state court's order, the DNA test results were "not favorable to [Rose] in that they confirm that blood was found on his pants which matched the blood on the concrete block which was used to murder the victim."

who represented Rose at trial.[2]

Rouson found that Rose "absolutely was a difficult client to represent." It was apparent to Rouson "after talking with [Rose] a few times why some of the other lawyers jumped off the case." Rose's trial was to begin on April 11. Rouson wanted to continue the trial, but Rose refused to waive his speedy trial rights and wanted to go to trial as scheduled. Rouson moved to withdraw but ultimately convinced Rose to let the trial be continued to allow time for discovery. The state trial court re-set the trial for June 27, 1983.

## B.    Rouson's Pretrial Investigation

To prepare, Rouson received and reviewed files from Rose's previous attorneys, including all depositions and investigative materials.[3] Rouson interviewed Rose, visited Rose's girlfriend Barbara Richardson (the victim's mother), and talked with witnesses on the phone. Rouson visited the crime scene, researched legal issues, and attended a criminal defense conference.[4] Rouson

---

[2]Rouson was admitted to practice law in December 1980, after which he worked for a year with Gulf Coast Legal Services and spent sixteen months as a prosecutor. In June 1982 he entered private practice, doing mostly criminal defense. Before Rose's murder trial, Rouson had tried about 50 to 60 jury trials.

[3]The details of Rouson's pretrial preparation comes from his testimony at the evidentiary hearing held in Rose's state postconviction case. Rouson was unable by that time to find his file from Rose's case, and therefore did not have it available to aid his recollection.

[4]For part of the pretrial period, Rouson was assisted by an attorney named Terry West, who performed legal research, worked on motions, and spoke with the court-appointed

prepared for the penalty phase in the course of preparing for trial.[5] Rouson looked

at both potential mitigating and aggravating factors, because Rouson wanted "to

anticipate what the state is going to allege is aggravating and try to make it out to

be mitigating or try to look at it to see if there is a positive side to it or if there is

something that I can argue that can make what might be aggravating on its face

mitigating in substance at least."

Rouson acknowledged that having family members testify about Rose's

childhood and life was important. Rose, however, told Rouson his family would

not testify or "stand up in his behalf" and their testimony would not be helpful.

On June 23, 1983 (four days before the guilt phase began), the state trial

court granted Rouson's motion to appoint a psychologist (Dr. Vincent Slomin) to

_____

psychologist. West never entered a formal appearance in the case.

[5]Rouson testified:

In regard to the penalty phase I believe that in the course of preparing for the [trial] I also prepared for that. I recall researching the instructions thoroughly, separating out the aggravating, mitigating circumstances, looking through the notes I had, the depositions that I had, the information, that I had to discover what witnesses or evidence would be material not only for the guilt or innocence phase but also for the penalty phase. And I recall speaking to various attorneys at different points about it.

. . . .

I would have prepared for [the penalty phase] along with preparing for the [] guilt and innocence phase. My efforts did not become concentrated strictly on the penalty phase until after, of course, [Rose] was found guilty. But I prepared for the entire trial. I prepared for the guilt and the innocence phase as well as for the penalty phase, but you do that in the course of preparing the entire case.

4

assess Rose's competency and help with possible defenses, including mitigation evidence for the penalty phase. Rouson was concerned about Rose's competency because Rose was "absolutely adamant" that he was not present at the crime scene. Although Rouson spoke to Rose "on a number of occasions about insanity, about intoxication, about a lesser," "[n]othing would satisfy him. Nothing would appeal to him other than the fact that he just didn't do it, he wasn't there." Rouson reminded Rose "that this is death or life" and that Rose was "asking me to roll the dice[,] . . . to walk in there, not plead anything in a sense in mitigation or in your defense but it wasn't you." Though at first Rouson wondered about Rose's competency, after Rouson "said it to [Rose] over and over again and each time . . . [Rose] accepted what I was saying and then rejected it or accepted it, but still maintained that posture, . . . I went forward. I relied on the psychologist appointed by the court."

Rouson felt Rose's insistence on arguing he was not there limited Rouson's available defenses. Rouson stated that even on "the morning of trial I was still trying to convince him that we should at least consider the insanity defense or the intoxication defense and he would not consider either of them." Rouson acknowledged that, as the attorney, he maintained a "certain amount of control and direction" over trial strategy, but Rouson "tried to do that as best I could while

5

giving [Rose] what he wanted, while trying to listen to his objections and his protestations and abide by them within the parameters of the facts, the circumstances, the evidence in the case." Rouson believed "Rose was the type of client that if he didn't agree with my representation and what was happening, he would have said it out loud in court."

## C.    Dr. Slomin's Examination and Report

Rouson provided Dr. Slomin with Rouson's file, including a 5–6 page interview sheet about Rose's background, and spoke with Dr. Slomin before and after Dr. Slomin's examination of Rose. Dr. Slomin examined Rose for about two hours. The exam included a clinical interview, the Rorschach test, the Bender-Gestalt test, and the Bender Draw-a-Person test. Dr. Slomin never indicated he needed more background information on Rose.

Dr. Slomin's June 24, 1983 report noted, as to Rose's personal history, that Rose: (1) was married for nine years and divorced in 1978; (2) had two children, a 12-year-old son and an 8-year-old daughter; (3) had hand and facial scars from a 1982 car accident in which he "was propelled through the windshield of an automobile," requiring over 100 stitches; (4) attended two years of college at Prairie State, where he studied "psychology/mental health" and was a B student; (5) was addicted to heroin "on and off" from 1967-73 and received treatment at an

6

outpatient methadone maintenance program from 1973-76; (6) was never hospitalized for psychiatric reasons; (7) was an alcoholic who attended AA meetings but stopped about two weeks before Richardson's murder; (8) had parents who were both alcoholics, as were Rose's two brothers (his sister was not); (9) worked in a plumber's apprenticeship program in 1970-73 and 1976-77, without completing it, and worked for several weeks as a plumber's helper with his uncle in 1978, but then "became a 'beach bum'" who "only worked sporadically at odd jobs when he wasn't being supported by women"; (10) reported having "blackouts" in the past; and (11) was currently serving five years for aggravated assault.[6]

Dr. Slomin's report discussed Rose's "account of his actions on October 18, 1982." Rose told Dr. Slomin that he: (1) "gave plasma in Clearwater and received nine (9) dollars"; (2) "went to have some beers – 3 beers for ninety (.90¢) cents[ and] Butch [the victim] came in about the same time"; (3) "[s]hot some pool, and missed the bus again"; (4) "[g]ot in a fight, as someone threatened Butch" and Rose "gave him my shirt as he had lost it in the fight"; (5) [w]ent to another bar to

---

[6]Rose described his problems with his various attorneys, explaining that he dismissed Shipp and Eide because "they brought me to trial on aggravated assault and I was found guilty," that his third attorney withdrew voluntarily, and that his fourth one "had a bad attitude – I asked him to withdraw." Rose did not like Rouson, either. Rose told Dr. Slomin "he will speak up if he feels he is being misunderstood or mistreated by his attorneys."

shoot pool" and "began chasing someone at the end of the alley[,] . . . was hit behind the head and nose[,] . . . was bleeding" and was handed "half a pill[,] . . . Qualude [sic]"; (6) "heard someone talking about Butch being dead, and got into a shower stall and put toilet paper up my nose to stop the bleeding"; and (7) "couldn't find Butch[,] . . . saw flashing lights, and went home." Rose reported that "people kept filling up my glass (with beer) – I drank quite a bit." Rose found out Richardson was dead when he was "at home, I was asleep and the police came and arrested me."

Dr. Slomin's report described Rose's mental state: (1) "cooperative and lucid," (2) "not confused, circumspect, or delusional"; (3) "no indication of remorse," he "denies committing the crime, and has no recollection of the alleged offense"; (4) "oriented to person, time and place"; (5) "no signs of carelessness, confusion or . . . malingering"; (6) has "eye/hand coordination [that] is within normal limits"; (7) "intellectual functioning is in the average range of intelligence"; (8) "no indication of a thought disorder"; (9) "no evidence of a seizure disorder"; (10) "admits to blackouts in the past, but denies Delirium Tremens"; (11) "[n]o sensory defects"; (12) "denies auditory/visual hallucinations"; and (13) "[m]otoric behavior is within normal limits." Dr. Slomin's report concluded that Rose was: (1) "free of any psychotic symptoms";

(2) "aware of his behavior, but naive as to its consequences"; (3) a heavy abuser of alcohol and drugs; and (4) "ingesting alcohol and may have been in a 'blackout spell' at the time of the crime." Dr. Slomin noted that if the "trial reaches penalty phase, a mitigating factor may be that the Defendant was in a 'blackout spell' due to excessive alcohol consumption resulting in amnesic period." Dr. Slomin's "Diagnostic Impression" of Rose was "Antisocial Personality Disorder with Alcohol Abuse." Dr. Slomin concluded Rose was competent to stand trial and competent at the time of the offense.

After writing his report, Dr. Slomin met with Rouson about possible mitigating circumstances in the penalty phase. Dr. Slomin was given several files with information on Rose's background, family, and personal history. Dr. Slomin received "two large attorney file folders filled with notes, background related to previous history, background of the defendant, family members, and, . . . there may have been some hospitalization records." Dr. Slomin also received information from the State Attorney's office, including a rap sheet detailing Rose's prior arrests going back about ten years. Dr. Slomin and Rouson discussed (1) an insanity defense, which they ruled out, and (2) organic brain syndrome, but Dr. Slomin's testing and Rose's "recall at the time when [Dr. Slomin] spoke to him ruled that out." On the Bender-Gestalt Memory test, Rose correctly recalled seven

of nine drawings, whereas the average result is four drawings out of nine. Rose's performance was "inconsistent with any type of gross organic abuse as far as memory is concerned."

Dr. Slomin and Rouson discussed presenting a chronic substance abuse mitigating circumstance, but decided voluntary ingestion of alcohol or drugs would not be a good defense. Dr. Slomin suggested, and Rouson later agreed, simply to present Dr. Slomin's diagnosis and argue for life in prison.[7] Rouson and Dr. Slomin discussed their penalty phase options before the guilt phase began.

## D.    Guilt Phase

The guilt phase began June 27, 1983. The State called the witnesses to Richardson's murder. Catherine Bass, Melissa Mastridge, and Maryann Hutton were sitting in front of Mastridge's house at about 10:00 p.m. on October 18, 1982. Richardson and Rose walked down the street nearby. They obviously had been drinking. Bass, Mastridge, and Hutton heard a noise like glass breaking, turned, and saw Richardson lying on the ground. Rose walked into a vacant lot and looked for something in the weeds. Rose picked up a concrete block and

---

[7]Dr. Slomin and Rouson believed the antisocial personality disorder testimony was mitigating because they could explain Rose's behavior and then show the jury that Rose would function well in a prison environment and not need to be executed. Although the antisocial personality disorder diagnosis was "not . . . the best diagnosis to have," Dr. Slomin thought it would be better to be forthright with the jury.

10

returned to Richardson, who was lying on the ground.  Rose raised the block above his head and threw it down on Richardson's head.  It made a "thunk" sound as it hit, and Richardson rolled a bit to the side.  Rose picked up the block again, raised it over his head, and again pitched it down on Richardson.  Rose continued retrieving the block and pitching it down on Richardson, seven or eight times.  Mastridge ran to Carl Hayword's house to call the police.

Hayword testified that Mastridge came and told him someone was hitting somebody with a block.  Hayword told his wife to call the police.  Hayword went outside and saw Rose standing over Richardson, holding the block over his head.  Hayword yelled out to Rose, who looked over, dropped the block, and ran away.  Hayword and Bass drove around looking for Rose but did not find him.

Medical examiner Dr. Donna Brown testified that Richardson had injuries to his face and head, including lacerations on the left side of his head, abrasions on the right side of his face, a tear in his lip area, and many skull fractures.  The bones housing Richardson's eyes were fractured and pushed backward and down into his head.  The front part of Richardson's brain was torn.  Richardson's injuries were consistent with being struck in the head five to six times with a concrete block.  Richardson's head and brain injuries caused his death.  Richardson had blood in his lungs, indicating he did not die from the first blow but lived a few minutes

afterward. Richardson had a .19 blood alcohol level.

Mark Poole and Becky Borton, two acquaintances of Rose, testified they had been living with Rose at Barbara Richardson's house for two or three weeks. Shortly after 10:00 p.m. on October 18, 1982, Poole and Borton were returning home in Poole's pickup truck when they saw Rose hitchhiking three or four blocks from where Richardson was killed. Poole and Borton saw fire trucks and ambulances right before they saw Rose. Poole and Borton picked Rose up and drove him home. Rose told them he had just killed Butch Richardson. Poole thought Rose was joking. Rose replied, "I'm serious. I just killed Butch. I picked up a brick and I smashed his head in, into mush. If he's not dead, he's a vegetable." Poole did not believe Rose because he "was so calm. He wasn't shaking. There was nothing, you know. Just like he always was." Rose did not appear to be drunk. Poole asked Rose why he killed Richardson, and Rose said, "[be]cause I was angry at him."

Rose asked Poole and Borton where they had been that night, and after they told him, Rose said that he would say he was there, too. When they got home, Poole and Borton saw blood on Rose's nose and hand. Rose said he got in a fight with another hitchhiker.

Detective Peter Fire arrested Rose the morning after the murders based on

information from eyewitnesses and other police officers. Detective Fire read Rose his <u>Miranda</u> rights and interviewed him. Rose admitted that he and Richardson were out drinking together the night before. Rose said he broke up a fight between Richardson and another man, in the course of which Rose was punched in the nose and got blood on himself. Rose could not say how the fight caused him to get blood on his shirt, arms, and legs. Afterward Rose went to a girl's apartment with Poole and Borton. Poole drove them all home. Detective Fire confronted Rose with Poole's and Borton's statements that they picked him up hitchhiking. Rose said they were liars.

The State rested. The defense presented no evidence. The jury found Rose guilty of first-degree murder.

### E.      Final Penalty Phase Preparations

The guilt phase ended on a Thursday. At Rouson's request, the state trial court continued the penalty phase until Tuesday. In the meantime, Rouson spoke again with Rose, Dr. Slomin, and Barbara Richardson, jail social worker Josephine Singletary, and fellow attorneys, including veteran defense attorneys Ronald Eide and Pat Doherty. Rouson researched the penalty phase jury instructions and prepared his direct examinations. Rouson discussed specific mitigating and aggravating circumstances with Dr. Slomin and showed him related jury

13

instructions. Rouson suggested to Rose "that he should take the stand in the penalty phase and describe himself, tell the jury about himself."

After the guilty verdict, Rose still did not change his mind and permit Rouson to present a defense that would look into his mental problems at the time of the offense. Rouson was "still trying to walk the line between [Rose] saying he wasn't there, he didn't do it, and between trying to throw in these issues of intoxication and insanity, which would put him there." Rouson elaborated:

> [Rose] said he wasn't there. So it didn't matter a whole lot, intoxication or insanity, because he wasn't there. That's what my theory of defense was. That was what I worked on. That's what I worked towards. That's what he wanted me to do. That's – when I looked at the evidence, I wanted to project to the jury.
>
> In the penalty phase I tried to maintain that tight rope and it was tough. But I still wanted them to think that he was innocent and that they wrongfully found him guilty; therefore, they shouldn't sentence him to death, but life. But I tried to throw in the intoxication and insanity. To me that was a tough juggling act to do. I thought I walked the rope pretty good.
>
> So I couldn't hammer away at it necessarily, because I didn't want to concede to them and I didn't want to project to them that, yeah, he did it; he did it, but you ought to consider this.

## F. Penalty Phase

The penalty phase began on Tuesday, July 5, 1983. The State introduced certified copies of Rose's prior convictions. In 1968, at age 18, Rose pled guilty to robbing a woman in Lake County, Illinois and was sentenced to one to ten years

14

in a reformatory. In 1979, Rose pled guilty to an aggravated battery in Cook County, Illinois for beating a man with nunchakus, pool sticks, and beer bottles and was sentenced to four and a half years in prison. At the same time, Rose pled guilty to burglary and was sentenced to four and a half years in prison.

Rose was paroled in Illinois and absconded from parole. Michael Craft, an investigator with the Illinois Department of Corrections, testified that on April 29, 1981, a parole violation warrant issued for Rose. The Illinois warrant was outstanding (1) on March 29, 1982, when Rose assaulted a man named Tommy Walker in Florida, and (2) on October 18, 1982, the day Rose murdered Richardson in Florida.

In the penalty phase, the State called Walker to testify about the March 1982 aggravated assault. Walker was driving home when he saw another car bump a car that was in front of it three or four times. Rose and another man got out of the rear car and "started beating on" a man in the front car. Walker stopped his car and called out to the men, who told him to go back to his car. Walker refused. Rose and the other man advanced on him. Walker got a tool out of his car to defend himself. Rose threw a three- or four-inch long pipe at Walker, hitting him in the neck. Rose took a drywall hatchet out of Walker's car. Rose, the other man, and the driver of Rose's car advanced on Walker. Walker tried to run, but

15

fell. Rose and the others beat Walker. Walker suffered a head injury and broken arm, and was out of work for two and a half months. In November 1982, Rose was convicted of aggravated assault against Walker and was sentenced to five years in prison.

After the State rested, Rose called Dr. Slomin, who testified he was a clinical psychologist with experience counseling persons with alcohol abuse problems. For about three and one-half hours, Dr. Slomin examined Rose and interviewed Rouson and the prosecutor for information about Rose's background, history, and alleged offenses. Dr. Slomin learned Rose's parents and brothers were alcoholics. Dr. Slomin opined that Rose may have had an alcoholic "black-out spell" at the time of Richardson's murder. Dr. Slomin explained that an alcoholic black-out spell is an amnesia state (i.e., the loss of consciousness or short-term memory) due to excessive alcohol consumption.

Dr. Slomin administered the Rorschach Ink-Blot Test to Rose and all of Rose's responses were within normal limits. Rose's "precepts were of a normal intelligent, by the way, bright individual." Dr. Slomin saw no delusions, no aggression, and no hostility. Most of Rose's responses "would be what was considered appropriate responses."

Dr. Slomin diagnosed Rose with antisocial personality disorder and

16

explained how persons with this disorder functioned adequately in prison. Having treated persons with antisocial personality disorder, Dr. Slomin opined that in a prison environment, Rose "would be able to function . . . adequately because his peers and his colleagues, many of them, will have the same type of disorder or personality and they relate well with one another." Dr. Slomin saw "no bad consequences" of Rose being in a jail setting.

On cross-examination, Dr. Slomin acknowledged that Borton and Poole testified that Rose told them he killed Richardson and tried to get them to help him establish an alibi. Dr. Slomin admitted that such conduct would not be consistent with a person who suffered an alcoholic black-out. It would be consistent with antisocial personality disorder, however.

Rose called Josephine Singletary, a social worker in the local jail, who testified Rose was in her group counseling sessions for the last three months. Rose participated fully in the sessions and "did a lot of reevaluating." Singletary believed Rose had "made the appropriate adjustment" to living in the jail environment and she was not aware of any negative reports of Rose's behavior.

Rose called Barbara Richardson, the victim's mother. Barbara Richardson loved Rose and he had been like a husband to her. She said Rose: (1) was "a very good person"; (2) "taught me a lot, [about] survival, not to be selfish, not to be self

17

centered"; (3) "[t]aught me to be a woman"; and (4) "is a beautiful person." Rose attended Alcoholics Anonymous when he met Barbara, and was faithful in attending. Rose stopped living with Barbara a couple of times so he could try to get his life in order. Rose felt Barbara was not supportive of his efforts to reform his life.

Barbara Richardson also testified that her son, the victim, tried to kill her with a gun. Defense counsel Rouson asked Barbara whether Rose had ever "come to your defense or to your aid when engaged in any altercation or fight with your son." Barbara replied, "When I was in the hospital in the Intensive Care Unit, he was there twice a day. As far as my son, [Rose] loved my son." Rose tried to help her son a number of times. But Richardson was jealous of Rose, and Rose felt threatened by him. On cross-examination, Barbara admitted she did not believe Rose killed her son.

Rose testified at the penalty phase. Rose admitted he was an alcoholic, he sought treatment for his alcoholism, and knew there were "negative influences that I get involved in when I am drinking." Rose was the chairman of the Jail Alcohol Program that met weekly. Rose was very supportive of this program, was active in the jail's church, began a nightly prayer group, was taking a Bible study course, passed out Bibles to new prisoners, and was active in Singletary's counseling

group.

Rose testified that he loved the victim Butch Richardson, had helped him, and was not a selfish person or a killer, but that alcohol "got[] [him] into a lot of negative environments." Rose testified that he did not kill Richardson, did not deserve to die, and wanted to live. On cross-examination, Rose admitted that he was on parole and had absconded.

Rose listed his occupation as a plumber, but he worked only one month in the two years before his arrest. During most of that period, Rose lived with Barbara Richardson. At some point, Butch Richardson started living with Rose and Barbara. Rose and Richardson "had differences of opinions."

The defense rested. The State, in rebuttal, called probation officer Patricia Tastis, who interviewed Rose for a presentence report ("PSI") for Rose's 1982 aggravated assault conviction. Rose falsely told Tastis he had never been married and had no children. After deliberating, the jury recommended a sentence of death by a 9-3 vote.

## G.     Sentencing and Direct Appeal

At sentencing, the PSI stated that Rose was the "oldest of 4 children born to

Edward Rose . . . and Mary Rose," who lived in Holiday, Florida.[8]  Rose reported

that he: (1) "was raised by his parents who were both alcoholics and he

experienced physical and mental abuse"; (2) was born and raised in Chicago,

Illinois, and moved to Florida in 1980; (3) graduated high school and attended

Prairie State Junior College for two years; (4) was a plumber and attended trade

school through a plumbers union; (5) "has never been married and has fathered no

children"; (6) lived with Barbara Richardson for about sixteen months, and before

that lived with his parents for about three months; (7) is a Christian; (8) "drinks

beer on a daily basis, as much as he can and is currently attending AA"; (9) first

smoked marijuana when he was 21 years old and last smoked it around July 1982;

(10) did not use other illicit drugs; (11) was hospitalized for eight days after being

injured in a 1982 car accident; and (12) worked for about one month in the

previous two years because "his girlfriend [Barbara Richardson] did not want him

to work."

On July 8, 1983, the state trial court sentenced Rose to death.  The state trial

court found three statutory aggravating factors: (1) Rose committed the murder

---

[8]The state trial court informed counsel that it had the PSI from Rose's 1982 aggravated assault conviction against Walker and that because Rose had been in custody continuously from the time that PSI was prepared, nothing would be gained by updating the PSI.  The State and Rouson agreed.

while under a sentence of imprisonment; (2) Rose was convicted, before the murder, of violent felonies (robbery, aggravated battery, and aggravated assault); and (3) Rose committed the murder in a cold, calculated, and premeditated manner, with no pretext of legal or moral justification. The state trial court found no statutory mitigating factors. As to non-statutory mitigating factors, the state trial court found there were "none, except the bare assertion by Barbara Richardson, the mother of the victim and [Rose's] lover, that [Rose is] a good person . . . [and] didn't or couldn't do this." The state trial court noted that "[t]he evidence is overwhelmingly to the contrary."

The Florida Supreme Court affirmed Rose's murder conviction and death sentence. Rose v. State, 472 So. 2d 1155, 1156 (Fla. 1985) ("Rose I"). Rose's counsel filed a certiorari petition with the United States Supreme Court, but at Rose's request, Rose's counsel withdrew the petition before it was ruled upon.

## H. Rule 3.850 Motion and Evidentiary Hearing

In 1987, Rose filed a Florida Rule of Criminal Procedure 3.850 motion for postconviction relief. As amended, Rose's 3.850 motion claimed that trial counsel Rouson was ineffective for failing to investigate and present mitigating evidence at the penalty phase. In 1988, the state trial court (the same judge at Rose's trial) held a four-day evidentiary hearing. As already set forth above, Rouson testified

21

about his penalty phase investigation and presentation.  Because Rose claims Rouson should have called his two cousins and his brother as mitigation witnesses, we now review their 3.850 testimony in detail.

1.    Cousin Linda Kravec

Linda Kravec, Rose's cousin, testified that she knew Rose's parents and saw Rose about once or twice a year growing up.  Rose's mother "was a very domineering person," "had a bad temper," "drank a lot," and was "known to cuss everyone and anyone."  She called Rose and his cousins "no-good sons-of-bitches," "bums," and "no-goods."  Rose's mother verbally abused Rose whenever she drank or was angry.  Several members of Rose's family had drinking problems.  Rose's parents more than once slapped him when he did not do what he was supposed to.  Rose's parents were not supportive of him and "[i]t was like . . . [Rose] was being ridden all the time."

Kravec was not contacted by Rouson, but would have been willing to testify.  On cross-examination, Kravec admitted that, until she began visiting Rose after he was sentenced to death, she had not seen Rose for more than fifteen years.  Kravec was not aware at the time of Rose's trial that he was a parole absconder.  Kravec admitted Rose's family was not close, and it would be fair to say they might not be inclined to help Rose even if asked to do so.

## 2. Brother David Rose

David Rose, the brother, testified Rose left home when he was about 15 years old and David was 8 or 9. Rose was raised by his mother and his stepfather, who was the biological father of David and his other siblings. Rose's mother and stepfather drank and argued frequently. A few times, they would physically fight, and the children would hide. Rose's mother and stepfather would go out to drink at bars and leave Rose in charge of the children. Rose was a good babysitter and looked after David and his siblings.

David, like his parents and his brothers, has a drinking problem. David testified, "something always happens when I start drinking; I start arguing and fighting. It just takes the first one." Rose, like David, had trouble stopping once he started drinking.

Rose's mother was the disciplinarian of the family. She "would always send us to the basement and come down there and beat us." The beatings left bruises. Rose's mother did not show the children affection and "used to hit us for losing fights, too, when we were younger. . . . If somebody beat us up, she would hit us and tell us to go out there and hit them back." Rose's stepfather did not have much to do with the kids. David could not recall Rose's stepfather ever telling David or Rose that he cared about them.

Sometimes Rose's stepfather did not buy the children food for a couple of weeks while he was arguing with Rose's mother, and the children had to eat at the neighbors' house or wherever they could find food. Sometimes Rose's stepfather would leave for days at a time when he was fighting with Rose's mother. David testified his parents "fought a lot, but they tried."

David recalled Rose being bedridden with rheumatic fever. Other children would talk about Rose being sickly and dark-complected. Rose was sensitive about it. Rose began drinking about age 15 or 16 years, which David recalled because Rose got drunk and fought their stepfather. Shortly after that, Rose left home for reform school.

When Rose was drinking, he "would be all right for a while, and then he would start getting rowdy. You couldn't say nothing bad to him." Rose, when drinking, "was the kind of guy that always tried to get the first punch in." Rose was different when he was not drinking. When sober, Rose was "more into books and stuff" and needed to be provoked to get into a fight.

Rose used "acid, crystal methadrene [sic], speed, marijuana, alcohol; whatever everybody else was [doing]." About 13 or 14, Rose was caught sniffing glue. Rose was hospitalized for hepatitis that he got from a dirty heroin needle. Rose was pistol-whipped in the head once. Rose was in a car accident that sent

him to the hospital and "messed [him] up real bad."

Rose married and had two kids. David used to babysit Rose's children. Rose was a good father who took his children to the library and taught them things. Rose was a good brother to David. Rose, who was seven years older than David, tried to act as a father figure, taking him fishing and sticking up for David.

David testified his mother was greatly affected by a car accident before Rose's trial. She had broken bones in her head and impaired hearing. Since the accident, she is "pretty fragile" and does not handle stress well. David did not think she could handle coming to testify.

David had no contact with Rouson, but would have testified at Rose's trial. David knew nothing about Rose's trial except what he read in the newspaper. On cross-examination, David admitted he did not try to contact Rose's attorney during the trial because David was in trouble for aggravated battery. David reiterated that Rose was a violent person when drinking or using drugs, and that Rose drank or used drugs regularly. David's aggravated battery conviction and Rose's aggravated assault conviction stemmed from a violent encounter (the attack on Tommy Walker) in which both Rose and David participated. David agreed that Rose's family did not think well of Rose.

3. Cousin Cheryl Stark

25

Cheryl Stark, Rose's cousin and Kravec's sister, testified that Rose's parents were alcoholics, as were her parents. When drinking, their parents would become "very irritable with the children." Rose's mother was "real strict about the way the kids behave" and believed "children are to be seen and not heard at all." Stark was not around much when Rose was growing up. When Stark did see them, Rose's mother "would always be really angry and irritable with [Rose]." Stark "only [saw Rose's mother] be verbally abusive of any of her children when she was drunk, but she was drunk most of the times [Stark] saw her." Rose's mother called her children names like "no-good bums," "son-of-a-bitches," or "bastards." Rose's mother acted that way if the children did "[l]ittle things like if the kids didn't want to be hugged or kissed when she would come in from drinking and they would try to pull away." Sometimes there was no provocation at all.

Rose's stepfather deferred to Rose's mother, but he also drank a lot and was verbally abusive to the children. Rose's stepfather would get in arguments and "just rant and rave most of the time."

### 4. Dr. Harold Krop

Rose's postconviction counsel retained forensic psychologist Dr. Harold Krop to evaluate Rose. Dr. Krop spent about seven to eight hours with Rose interviewing him and giving these tests: the Wechsler Adult Intelligence Scale

26

("WAIS"), the revised version of the Wechsler memorization test, the facial recognition test, the Bender-Gestalt test, the Ray auditory memory test, and a malingering test. Dr. Krop did not see evidence of malingering. Dr. Krop interviewed members of Rose's family[9] and reviewed Dr. Slomin's testing data, Rose's trial transcript, the PSI, and the postconviction pleadings.

Dr. Krop testified that Rose: (1) had "an extremely unstable background"; (2) was not raised by his biological father; (3) had alcoholic parents; (4) suffered "considerable emotional abuse" of a verbal nature and "some physical abuse"; (5) "was viewed as different by his parents" and called "their nigger" and "the black sheep of the family" and subjected to other "derogatory and critical statement[s]"; (6) "was a very sickly child" who had rheumatic fever and was hospitalized for high fever and convulsions; (7) was the product of a difficult forceps delivery; (8) had a nail driven into his skull at age 7 or 8; (9) was "fairly popular in school," "participated in various athletic activities," and "associat[ed] with . . . the jocks or athletes in the school"; (10) began drinking and using drugs and sniffing glue around age 12, developing "a chronic pattern of drug . . . and alcohol abuse" including heroin addiction; (11) received treatment in a residential drug abuse program for three months, substituting methadone for heroin addiction and

_____

[9]Rose's lawyers told Dr. Krop that Rose's mother refused to talk to him or to testify.

27

requiring in-patient or residential treatment; (12) participated "on an intermittent basis in AA"; (13) had no history of psychiatric treatment or mental illness; (14) quit school in tenth grade and was not allowed to join the military; (15) "started getting into criminal trouble" around age 16 or 17, and was first jailed about that time, beginning "a vicious circle" of "illegal and anti-social activities," usually associated with drinking or drug abuse; (16) had one job for about three years; (17) was married once and had two children; and (18) had "a very heavy and intense involvement with" Barbara Richardson that was "a pathological relationship" that "precipitated his not working" or attending AA.

Dr. Krop testified that Rose had average intelligence, with a verbal IQ of 97, a performance IQ of 100, and a full-scale IQ of 98. However, Rose showed significant deficits in certain WAIS sub-tests involving recall, concentration, and social judgment. Rose did poorly on the facial recognition test, which is "consistent with a diagnosis of brain damage." Based on the neuropsychological findings, Dr. Krop concluded there was "some evidence . . . of some degree of organic brain damage." However, Dr. Krop found it difficult to determine the nature of the brain damage. Dr. Krop opined there "is minimal brain damage existing, most likely in the right temporal lobe area, but that would need to be documented further in neurological and objective types of testing." As to why

28

Rose was possibly brain damaged, Dr. Krop said there were several possibilities, noting Rose's forceps delivery, the nail driven into his head, the high fever, and the chronic substance abuse.

Dr. Krop agreed with Dr. Slomin that Rose was competent to stand trial and was not insane at the time of the crime, and that no statutory mitigating circumstances applied. Dr. Krop diagnosed Rose as a "chronic alcohol abuser, possibly with a dependent personality disorder." To make that diagnosis, Dr. Krop would need more information about Rose's relationships with his parents, wife, girlfriend, and friends. Dr. Krop testified that "essentially the most primary diagnosis would be organic brain syndrome and, also, the chronic alcohol and drug abuse."[10]

Dr. Krop found significant that Rose made efforts to rehabilitate himself, for example by going to AA meetings voluntarily. Dr. Krop added that Rose even in jail and on death row "has not been a management problem" and "made efforts to cope by doing constructive kinds of things, [such as] writing poetry, letters, and he seems to be making an effort to rehabilitate himself within the [prison]

---

[10]Dr. Krop concluded that he could not diagnose Rose as having antisocial personality disorder. Although Rose exhibited antisocial behavior, Dr. Krop lacked information confirming that Rose engaged in the required antisocial behaviors before age 15.

Dr. Krop lacked access to Rose's juvenile record or school records prior to high school. The family members Dr. Krop spoke to were more familiar with Rose's parents than they were with Rose, and they "did not have . . . much direct contact with [Rose]."

restrictions."

Dr. Krop opined that Rose did not satisfy any of the statutory mitigating factors.[11] Dr. Krop did not believe Rose "was severe or extreme in terms of mental disturbance," for example. However, Dr. Krop opined that several non-statutory mitigating circumstances applied, including Rose's: (1) abusive and neglectful upbringing by cold, uncaring, alcoholic parents; (2) being a sickly child viewed as different, leading to "an inadequate self-concept"; (3) alcohol and drug abuse; (4) organic brain syndrome with "at least minimal brain damage"; (5) intoxication at the time of the murder; (6) recognition of his alcoholism and attempts to rehabilitate himself; and (7) ability to function in a prison environment. As to statutory aggravating factors, Dr. Krop was unable to reach a conclusion on whether the crime was cold, calculated, and premeditated.

Dr. Krop's conclusion as to Rose's intoxication at the time of the murder was based on Rose's self-report that he had 20 or more beers that day. Dr. Krop acknowledged that "the more a person lies regarding anything, the more difficult it is to make an accurate diagnosis" of that person. Dr. Krop admitted that Rose "has given inconsistent information to various people" about his background, including

---

[11]For example, although Dr. Krop believed, based on Rose's self-report, that Rose was intoxicated at the time of Richardson's murder, Dr. Krop did not believe Rose's intoxication amounted to an extreme mental disturbance for statutory mitigation purposes.

his marital status, parole status, criminal history, academic background, and whether he had suffered head injuries. With Dr. Krop, Rose maintained he was innocent of Richardson's murder.

### 5. Dr. Vincent Slomin

At the 3.850 hearing, Dr. Slomin maintained that his diagnosis in his June 24, 1983 report was still correct. Dr. Slomin reviewed the results of the WAIS test that Dr. Krop administered to Rose, and Dr. Slomin found the results were not enough to make a definitive diagnosis of organic brain damage. Dr. Slomin said some of the depressed scores on different subparts of the test could be explained by the circumstances surrounding the test taking, such as the subject's feelings of anxiety or depression and his education level. Moreover, Rose's score on the similarities sub-part of the test, which measures the ability to analyze and synthesize given information, was "in the very superior range of intelligence" that was "comparable to an area of 132 or 135 in the IQ range." Such a result "is not consistent with the person who has an organic brain disorder." Dr. Slomin knew Rose suffered head injuries, but even with those, Rose's test results and level of functioning were not indicative of brain damage.

### 6. Dr. Robert Fox

Rose's postconviction counsel had forensic psychiatrist Dr. Robert Fox

31

evaluate Rose. In 1988, Dr. Fox interviewed Rose and reviewed background information. Dr. Fox testified that ideally his interview and examination should take between four and six hours, but he interviewed Rose for "only approximately an hour or a little bit more." Dr. Fox's only psychiatric diagnosis "with firm certainty" was that Rose "suffers from chronic and acute . . . alcohol abuse and intermittent alcohol intoxication." Rose's only extended period of sobriety was when incarcerated.

As to Rose's mental status, Dr. Fox found that Rose was oriented and his long-term memory was intact "except for those periods of time when he was suffering alcoholic blackouts." Other tests of the organic functioning of Rose's brain suggested "soft-signed organic impairment in . . . the area of concentration and the area of short-term memory." Dr. Fox found Rose's impairments to be "most consistent with an individual who has a long history of alcohol and drug abuse and who has sustained a number of severe head injuries."

Dr. Fox believed there were two statutory mitigating circumstances: (1) Rose was in a state of extreme mental or emotional disturbance at the time of the crime because of his alcoholism and intoxication, and (2) Rose's ability to form specific intent was impaired by intoxication. Rose told Dr. Fox he probably drank more than 20 beers the day of the murder, as well as smoking marijuana and taking

a pill believed to be a Quaalude. The eyewitnesses assumed Richardson and Rose were drunk.[12] Dr. Fox admitted he did not know Rose's intoxication level.

Dr. Fox found these non-statutory mitigating factors: (1) Rose grew up in an "extraordinarily disrupted" family; (2) the identity of his father was in dispute; (3) Rose's appearance differed from other family members, leading to his being ridiculed in school; (4) Rose was abused by his stepfather; (5) Rose began using drugs around age 12 or 13; and (6) Rose was in a number of relationships that "present a picture of an individual who was tied to others by the inadequacies beginning with the abuse in his early childhood."[13] Dr. Fox could not rule out that Rose had antisocial personality disorder, and admitted that whether Rose had antisocial personality disorder was "an open point."

Dr. Fox's tests of Rose suggested the possibility of organic brain syndrome. Based on Dr. Fox's one-hour examination, there "was evidence of a mild organic brain symptom," but Dr. Fox "did not feel that it was strong enough to make [the

---

[12]Dr. Fox opined that intoxication impaired Rose's ability to act in a cold, calculated, and premeditated manner.

[13]Dr. Fox believed that Rose was in an alcoholic black-out episode at the time of the murder, based only on Rose's claim not to remember the events of that evening and despite Poole's and Borton's testimony that Rose was not intoxicated when they drove him home after the murder. But Dr. Fox admitted that even in an alcoholic blackout state, someone may be perfectly capable of thinking rationally and forming an intent to kill. Dr. Fox was "not suggesting that the blackout is a mitigating circumstance."

33

diagnosis], even at the level that I found it."[14]

## I.    3.850 Denial and Appeal

In 1990, the state trial court denied Rose's 3.850 motion.  The state trial court found that Rose had not met his burden of establishing either deficient performance or prejudice.  Regarding performance, the state trial court reasoned (1) that Rouson was Rose's fifth attorney and was appointed less than three months before trial, and (2) Rose "did not wish to waive his right to a speedy trial" and Rouson "of necessity . . . had to rely more on direction given him by his client."  Regarding prejudice, the state trial court found Dr. Fox's conclusions unworthy of belief and remained confident Rose would have been sentenced to death even if all 3.850 witnesses had testified.

The Florida Supreme Court affirmed the denial of Rose's 3.850 motion. Rose v. State, 617 So. 2d 291 (Fla.1993) ("Rose II").  As to mitigation evidence, the Florida Supreme Court reviewed the procedural history and concluded that Rouson had limited time to prepare for trial due to Rose's own actions.  Id. at 293. The court also summarized Rouson's testimony:

---

[14]Rose's postconviction counsel submitted an affidavit from Rose's mother Mary Rose, who did not testify at the 3.850 hearing.  While Mary Rose's affidavit gave similar background information about Rose's alcohol and drug problems, sickly childhood, and his running away at age 16, her affidavit notably does not state that she would have testified at trial.

34

[Rouson] testified below that at the guilt phase of trial, Rose insisted on presenting the defense that he was innocent and was not present at the scene of the murder. Against [Rouson]'s advice, Rose would not allow counsel to pursue other defenses such as insanity or intoxication. According to [Rouson], Rose did not change his posture at the penalty phase. "When a defendant preempts his attorney's strategy by insisting that a different defense be followed, no claim of ineffectiveness can be made." Mitchell v. Kemp, 762 F.2d 886, 889 (11th Cir.1985), cert. denied, 483 U.S. 1026, 107 S. Ct. 3248, 97 L. Ed. 2d 774 (1987). [Rouson] testified that once the case reached the penalty phase, he tried to raise issues of insanity, intoxication, and lack of specific intent to the extent possible while still maintaining Rose's innocence.

Rose II, 617 So. 2d at 294. In light of this evidence, the Florida Supreme Court concluded that "[g]iven the limitations placed on him by Rose, [Rouson] made reasonable tactical decisions with respect to the presentation of mitigating evidence." Id. The Florida Supreme Court cited Jones v. State, 528 So. 2d 1171, 1175 (Fla. 1988), where it had held that an attorney who had argued his client was innocent in the guilt phase made a "reasonable tactical decision in not calling [a] psychiatrist to testify at [the] penalty phase that [the] defendant was paranoid [because] counsel concluded that the testimony would destroy the defense's credibility with the jury and would not harmonize with other mitigating evidence." Rose II, 617 So. 2d at 294.

The Florida Supreme Court found that Rouson (1) conducted a reasonable investigation into alcoholism- and intoxication-based mitigating evidence; (2)

35

"made reasonable tactical decisions with respect to the existing mitigation"; and (3) "discussed potential mitigating factors with Dr. Slomin" before the penalty phase.  Id.  The court pointed out: (1) "Dr. Slomin diagnosed Rose as suffering from antisocial personality disorder with alcohol abuse"; and (2) "ruled out the possibility of organic brain syndrome because of the results of testing and because of Rose's recall of the events on the night of the murder."  Id.  The court found Rouson and Dr. Slomin "determined that the best course of action was to present the facts to the jury and argue that a person with antisocial personality disorder could function well in prison and should not be executed."  Id.

The Florida Supreme Court reviewed the expert testimony and concluded that the state trial court did not abuse its discretion when it rejected Dr. Fox's opinions as far-fetched and not credible.  Id. at 293-94.  The court noted that Dr. Krop (1) diagnosed Rose with chronic drug and alcohol abuse and minimal brain damage, (2) found no statutory mitigating factors, but (3) found these non-statutory mitigating factors: an abusive, neglected childhood environment with alcoholic parents, he was a sickly child "viewed as different by his parents, peers, and himself," and intoxication at the time of the murder.  Id. at 293.

As to prejudice, the Florida Supreme Court concluded that there was no reasonable probability of a different sentence if Rouson had presented the

36

alcoholism and intoxication evidence from the 3.850 hearing. Id. The court stressed that (1) "[t]he jury was aware of most of the nonstatutory mitigation brought out by Dr. Krop"; (2) Dr. Slomin told the jury in the penalty phase that Rose's parents and brothers were alcoholics and "that Rose may have been in an alcoholic blackout at the time of the offense"; and (3) the jury knew "that Rose was an alcoholic" and "had consumed a substantial amount of alcohol prior to the murder." Id.

Finally, the Florida Supreme Court found that Rouson was not ineffective for not presenting this evidence from Rose's cousins and brother—that "Rose's parents were alcoholics and were verbally abusive," Rose's mother was physically abusive, Rose had "a chronic drinking problem," Rose had rheumatic fever as a child, and "other children picked on Rose because of his dark complexion"— because Rose was 32 years old when he murdered Richardson. Id. The Florida Supreme Court noted that (1) Rouson did not contact Rose's family because Rose told him the family would be not helpful, (2) "one of the cousins admitted that she saw Rose's family only once or twice a year as she was growing up" and had no contact with Rose for more than twenty years before 1987, and (3) Rose's brother "admitted that Rose is a violent person when he is drinking or on drugs and that this has been a continuous pattern since childhood." Id. at 294-95. The Florida

37

Supreme Court concluded that "[i]n light of the harmful testimony that could have been adduced from Rose's brother and the minimal probative value of the cousins' testimony, we are convinced that the outcome would not have been different had their testimony been presented at the penalty phase." Id. at 295.

The United States Supreme Court denied Rose's certiorari petition. Rose v. Florida, 510 U.S. 903, 114 S. Ct. 279 (1993).

## J.    Federal Habeas Proceedings

Rose filed his 28 U.S.C. § 2254 federal habeas petition on July 19, 1993. The district court stayed Rose's case for several years to await, among other things, the outcome of additional state court proceedings.[15]  On March 19, 2010, the district court denied Rose's § 2254 petition and later denied Rose's motion for a certificate of appealability ("COA").  This Court granted Rose a COA as to a single issue only: "Whether Petitioner Rose received ineffective assistance of trial counsel in the penalty phase as a result of trial counsel's alleged failure to investigate and present mitigation evidence."

## II.  STANDARD OF REVIEW

---

[15]In December 1996, Rose filed in Florida state court a successive 3.850 motion to vacate his death sentence, alleging among other things that the State withheld material exculpatory evidence and public records he had requested.  In February 1999, the state trial court denied Rose's successive 3.850 motion without an evidentiary hearing.  The Florida Supreme Court affirmed.  Rose v. State, 774 So. 2d 629 (Fla. 2000), overruled by Guzman v. State, 868 So. 2d 498, 506 (Fla. 2003).

Rose filed his § 2254 petition before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), so pre-AEDPA law governs. Puiatti v. McNeil, 626 F.3d 1283, 1307 (11th Cir. 2010). We review de novo the district court's denial of Rose's § 2254 petition, as well as all the district court's subsidiary legal conclusions and all mixed questions of law and fact. Turner v. Crosby, 339 F.3d 1247, 1273 (11th Cir. 2003). We review the district court's factual findings under a clearly erroneous standard. Id. "Whether a defendant received ineffective assistance of counsel is a mixed question of law and fact, and we therefore review it de novo." Id.

We also review de novo the state courts' resolution of questions of law or mixed questions of law and fact. Puiatti, 626 F.3d at 1307. A presumption of correctness applies to factual findings made by state trial and appellate courts. Id.; Turner, 339 F.3d at 1273. "'This deference requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even fair support in the record.'" Id. (quoting Marshall v. Lonberger, 459 U.S. 422, 432, 103 S. Ct. 843, 850 (1983)).

### III.  DISCUSSION

**A.    Ineffective Assistance of Counsel: Legal Standards**

39

To prove ineffective assistance of counsel, Rose "must show both (1) 'that [his] counsel's performance was deficient,' and (2) 'that the deficient performance prejudiced the defense.'" DeYoung v. Schofield, 609 F.3d 1260, 1283 (11th Cir. 2010) (quoting Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)), petition for cert. filed (U.S. Jan. 14, 2011) (No. 10-8456, 10A451).[16]

The performance prong always entails a deferential review of counsel's conduct. Reed v. Sec'y, Fla. Dep't of Corr., 593 F.3d 1217, 1240 (11th Cir.), cert. denied, 131 S. Ct. 177 (2010); see Premo v. Moore, 562 U.S. —, 131 S. Ct. 733, 740 (2011) ("Even under de novo review, the standard for judging counsel's representation is a most deferential one."). "[T]o establish deficient performance, a defendant must show that his counsel's conduct fell below an objective standard of reasonableness in light of prevailing professional norms at the time the representation took place." Reed, 593 F.3d at 1240 (quotation marks omitted). "In assessing the reasonableness of counsel's performance, courts must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. (quotation marks omitted). "To overcome

---

[16]We note that the only claim before us in this appeal concerns whether trial counsel Rouson was ineffective for failing to investigate and present certain mitigation evidence. Rose has not raised, and the COA does not extend to, any claim of ineffectiveness as to any of the evidence that Rouson did present at the penalty phase.

40

<u>Strickland</u>'s presumption of reasonableness, [Rose] must show that 'no competent counsel would have taken the action that his counsel did take.'" <u>Allen v. Sec'y, Fla. Dep't of Corr.</u>, 611 F.3d 740, 751 (11th Cir. 2010) (quoting <u>Chandler v. United States</u>, 218 F.3d 1305, 1315 (11th Cir. 2000) (<u>en banc</u>)), <u>petition for cert. filed</u> (U.S. Feb. 14, 2011) (No. 10-9202, 10A524); <u>accord</u> <u>Harrington v. Richter</u>, 562 U.S. —, 131 S. Ct. 770, 790 (2011) ("<u>Strickland</u> . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.").

For prejudice, we ask whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694, 104 S. Ct. at 2068. "For penalty-phase ineffectiveness claims, the prejudice question is whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." <u>DeYoung</u>, 609 F.3d at 1284 (quotation marks and ellipsis omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Richter</u>, 562 U.S. at —, 131 S. Ct. at 787 (quotation marks omitted).

"In assessing prejudice under <u>Strickland</u>, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is

41

possible a reasonable doubt might have been established if counsel acted differently." Id. at —, 131 S. Ct. at 791. "The likelihood of a different result must be substantial, not just conceivable." Id. at —, 131 S. Ct. at 792.

In determining whether the prejudice prong is satisfied, "we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." Porter v. McCollum, 558 U.S. —, 130 S. Ct. 447, 453-54 (2009) (quotation marks and brackets omitted); see also Wong v. Belmontes, 558 U.S. —, 130 S. Ct. 383, 390 (2009) ("[T]he reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice.").

**B.    Analysis**

In Strickland, the Supreme Court advised that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Strickland, 466 U.S. at 697, 104 S. Ct. at 2069. Noting that "[t]he object of an ineffectiveness claim is not to grade counsel's performance," the Supreme Court stated that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

That is the course we follow here. We need not reach the issue of Rouson's

performance because we conclude that, even assuming <u>arguendo</u> that Rouson's performance was objectively unreasonable, the total mitigation evidence Rose proffers (in the penalty phase and the 3.850 evidence), viewed against the total aggravating circumstances, does not raise a reasonable probability of a different result.

There was, and is, substantial evidence in aggravation. Rose bludgeoned to death Butch Richardson, the son of Rose's girlfriend, with a concrete block. This was no fight, and there was no shred of threat or justification. Richardson lay helpless upon the ground the whole time, incapacitated by drink, while Rose went searching for a weapon, while Rose returned with a concrete block, while Rose hurled the block down on Richardson's head, while Rose picked it up and threw the block down on Richardson's head four or five more times. Afterward, Rose calmly announced to his housemates that he had just "picked up a brick and . . . smashed [Richardson's] head . . . into mush" and that if Richardson were not dead, "he's a vegetable." Rose said he killed Richardson simply "[be]cause I was angry at him." All this time, Poole testified that Rose "was so calm. He wasn't shaking. There was nothing, you know. Just like he always was."

And this was hardly Rose's first occasion for serious violence. He had prior convictions for robbery, aggravated battery, and aggravated assault. The jury

43

heard in detail how Rose, with his brother and another man, savagely beat Tommy Walker, leaving him out of work for months. Rose admitted he had absconded from parole, and he was wanted on escape and parole violation warrants at the time he murdered Richardson and savagely beat Walker.

In all, the state trial court found three statutory aggravating factors: (1) Rose was under a sentence of imprisonment (i.e., on parole) when he murdered Richardson; (2) Rose had prior violent felony convictions; and (3) Rose committed the murder in a cold, calculated, and premeditated manner, with no pretext of legal or moral justification. None of Rose's postconviction evidence undermines the statutory aggravating circumstances or establishes statutory mitigating circumstances.[17]

Instead, Rose's evidence at trial and in postconviction focuses entirely on non-statutory mitigation. And much of the evidence that Rose contends should have been presented was in fact already presented at the penalty phase. For example, Rose presented to the jury that he (1) was an alcoholic and persistently

---

[17]At the 3.850 hearing, Dr. Fox opined that two statutory mitigating circumstances existed (that is, Rose was in a state of extreme mental or emotional disturbance and Rose's ability to form specific intent was impaired). But the state trial court found that "Dr. Fox's conclusions as to the existence of statutory mitigating circumstances in this case were far-fetched and unworthy of belief" and "[n]o reasonable jury . . . would give [Dr. Fox's] testimony much, if any, weight." This finding by the state trial court was affirmed by the Florida Supreme Court and has ample support in the state court record.

44

abused alcohol; (2) tried to rehabilitate himself by attending AA meetings and by chairing the Jail Alcohol Program and attending Singleton's group counseling sessions; (3) was drinking heavily on the night of the murder and may have experienced an alcoholic blackout; (4) could adapt to the prison environment and function well there, as evidenced by his post-arrest rehabilitative efforts and his participation in a Bible study class and prayer group; and (5) was a good person when sober who had loved and tried to help Barbara and Butch Richardson. Importantly, the jury also knew that Rose's parents and brothers were alcoholics, too. Obviously, a petitioner cannot satisfy the prejudice prong of the Strickland test with evidence that is merely cumulative of evidence already presented at trial. See, e.g., Belmontes, 558 U.S. at —, 130 S. Ct. at 387 ("Some of the evidence [trial counsel Schick was allegedly ineffective for not presenting] was merely cumulative of the humanizing evidence Schick actually presented; adding it to what was already there would have made little difference. . . . Belmontes cannot establish Strickland prejudice."); Rhode v. Hall, 582 F.3d 1273, 1287 (11th Cir. 2009) (finding no prejudice and reasoning, inter alia, that "[c]ounsel is not required to present cumulative evidence"), cert. denied, 130 S. Ct. 3399 (2010). Moreover, as to Rose's evidence that he was a good person when sober, the evidence that he presented at trial arguably was even more powerful than what he

45

offered in postconviction proceedings, as Rouson elicited good-character testimony not from Rose's brother (who admitted Rose was frequently violent and who himself participated in Rose's attack on Walker), but from the mother of the murdered victim.

Further, the non-cumulative evidence Rose contends Rouson should have investigated and presented is weak. For example, as to the mental health evidence, Rose was in the normal range of intelligence, he had no history of psychological diagnosis or treatment, and the only diagnosis Rose's mental health experts could agree upon was that Rose suffered from alcoholism and chronic substance abuse, which not only is cumulative but also is not significantly mitigating. See Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1217 (11th Cir. 2007).

Although there was some testimony of possible organic brain damage, Dr. Krop testified only that he found "some evidence . . . of some degree of organic brain damage" but the amount was "minimal" and needed further documentation and objective testing to confirm. Dr. Slomin, on the other hand, found Rose's test results were insufficient to make a diagnosis of organic brain damage, and Dr. Slomin in particular found some of Rose's test results were "in the very superior range of intelligence" and were "not consistent with [a] person who has an organic brain disorder." Even Dr. Fox found that though there was some "evidence of a

46

mild organic brain symptom," that evidence was too weak to make a diagnosis "even at the level that I found it."

As to evidence of Rose's personal and family history, this evidence comes from three primary witnesses: Rose's brother David and his cousins Kravec and Stark.[18] The force of David's testimony is substantially weakened by: (1) his acknowledged participation with Rose in criminal activity, for David was one of the persons who helped Rose in his savage beating of Tommy Walker, a witness for the State at the penalty phase; (2) his unawareness that Rose left his family, abandoned his children, and never paid any child support; and (3) his admissions that Rose was regularly violent and aggressive and most of the family did not like Rose. Cousins Kravec and Stark testified about Rose's childhood, but acknowledged that they did not see Rose regularly during that time period—Stark testified she "wasn't around a lot when [Rose] was growing up," and her sister Kravec testified she saw Rose only about once or twice a year when he was growing up.[19] Importantly, Rose was 32 years old when he murdered Butch

---

[18]Although Rose's mother furnished an affidavit to his postconviction counsel, she did not testify in person at the 3.850 hearing. Testimony from other family members suggests Rose's mother would not have been willing and/or able to testify at Rose's trial, and her affidavit does not indicate that she would have done so.

[19]Kravec and Stark did not know Rose as an adult. Kravec admitted she had not seen Rose for about twenty years and did not know that he was a parole absconder who had been hiding from the law. Stark personally did not even know whether Rose drank.

Richardson, and sixteen years had passed since he left home. The mitigation evidence of Rose's childhood was substantially weakened by the chronological remove between his childhood and the murder. See Cummings v. Sec'y for Dep't of Corr., 588 F.3d 1331, 1368-69 (11th Cir. 2009) (finding petitioner Cummings's proposed penalty-phase testimony was weak and noting specifically as to his childhood evidence, "Cummings was 33 years old when he murdered Good, and the State would have stressed that his childhood was many years behind him"), cert. denied, 131 S. Ct. 173 (2010).

Rose's proposed mitigation evidence of his personal and family background included testimony that: (1) Rose's parents were alcoholics and were verbally abusive to Rose when they drank; (2) Rose's mother was domineering and had unpredictable outbursts of temper; (3) Rose's parents were critical of him and slapped him when he misbehaved; (4) Rose's parents argued with each other frequently and on a few occasions would physically fight; (5) Rose's parents would go out drinking and leave Rose in charge of the other children, and Rose was a good babysitter; (6) Rose's stepfather was physically and emotionally distant; (7) Rose's mother called her children names like "no-good bums," "sons-of-a-bitches," or "bastards," and would "send [her children] to the basement and come down there and beat [them]," and she hit Rose and David for losing fights;

(8) Rose was a sickly child with rheumatic fever; (9) children would taunt Rose for being sickly and dark-complected; (10) Rose began drinking when he was 12 to 16 years old, and he used other drugs, including acid, speed, marijuana, and heroin; (11) when Rose drank he would "start getting rowdy," but when he was sober he was "more into books and stuff" and had to be provoked to fight; (12) Rose was a good brother to David and tried to be a father figure to him; and (13) Rose was a good father to his two children and took them to the library and taught them things.

A lot of Rose's proffered mitigation testimony is double-edged or even aggravating. See, e.g., Suggs v. McNeil, 609 F.3d 1218, 1231 (11th Cir. 2010) (noting that "evidence of drug and alcohol use is often a 'two-edged sword' that provides an independent basis for moral judgment by the jury," and that evidence that the defendant spent time at military school because of behavioral issues "was potentially damaging" (quotation marks and citation omitted)), petition for cert. filed (U.S. Jan. 18, 2011) (No. 10-8579, 10A489); Reed, 593 F.3d at 1246 ("[I]t would have been all too easy for the State to use Reed's own mitigation witnesses to paint him as a violent, manipulative person with long-standing drug abuse issues and brushes with the law. . . . Here, it was not just a reasonable probability, but a virtual certainty that Reed's 'good' mitigation evidence would have led to

49

the introduction of 'bad' evidence.").

For example, David Rose testified that: (1) Rose went to reform school after fighting his stepfather; (2) when he drank or used drugs, Rose was violent and "the kind of guy that always tried to get the first punch in"; (3) Rose drank or used drugs regularly; and (4) Rose's family (apart from David Rose) did not think well of him. Rose's 3.850 evidence also revealed that Rose consistently lied about his background, for example by: (1) saying he quit school in tenth grade, and reporting at another time that he graduated high school and attended two years of college; (2) stating he never married and had no children, and indicating at another time that he was divorced with two children; and (3) suggesting he was a popular athlete in school, and claiming later that he was ridiculed by other students for being sickly and dark-complected. Dr. Krop testified that Rose had a "pathological relationship" with Barbara Richardson, which led to Rose's decisions to stop going to AA meetings and not to work. Dr. Krop also reiterated that, based on his research, Rose's family thought of him as "the black sheep of the family." Indeed, Dr. Krop's denigration of Rose's relationship with Barbara Richardson would have been particularly harmful, as it would undercut the testimony of Barbara Richardson, who otherwise was a very sympathetic penalty-phase witness for Rose. And David Rose's testifying Rose was a good father

would have opened up the issue of how Rose allegedly never provided any child support and eventually abandoned his children.

In any event, Rose's 3.850 testimony falls far short of the powerful evidence that has been held sufficient to satisfy the prejudice prong in a brutal murder case. See, e.g., Porter, 558 U.S. at —, 130 S. Ct. at 454 ("Had Porter's counsel been effective, the judge and jury . . . would have heard about (1) Porter's heroic military service in two of the most critical—and horrific—battles of the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling."); Rompilla v. Beard, 545 U.S. 374, 390-93, 125 S. Ct. 2456, 2467-69 (2005) (Rompilla's trial counsel failed to discover or present evidence that Rompilla (1) had test results pointing to schizophrenia, fetal alcohol syndrome, and stunted mental development, (2) was beaten by his father with fists, leather straps, belts, and sticks, (3) was locked in a small wire mesh dog pen filled with excrement, (4) was not allowed to visit other children or speak on the phone, and (5) lived without indoor plumbing, slept in an unheated attic, and attended school in rags); Wiggins v. Smith, 539 U.S. 510, 516-17, 534-35, 123 S. Ct. 2527, 2532-33, 2542 (2003) (trial counsel offered no evidence of Wiggins's life history, which included (1) being left alone for days at

51

a time with no food, forcing him to beg for food and eat paint chips and garbage, (2) beatings for breaking into the locked kitchen, and (3) being passed among various foster homes, where he was physically abused and also suffered repeated molestations, rapes, and gang-rapes).

And here the new mitigation is simply an extension of what the jury had heard, which is critically different from the above cases, in which the new mitigation was not only powerful, but of a type that counsel did not present in the penalty phase at all. See Porter, 558 U.S. at —, 130 S. Ct. at 454 (noting that the "judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability," including the powerful evidence of Porter's heroic and emotionally scarring military service); Rompilla, 545 U.S. at 393, 125 S. Ct. at 2469 (finding that the evidence discovered after trial "adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury"); Rutherford v. Crosby, 385 F.3d 1300, 1315 (11th Cir. 2004) ("[T]his is not a situation like the one in Williams v. Taylor or Wiggins v. Smith, where the jury heard very little mitigating circumstance evidence and heard none at all about the type of mitigation presented during the post-conviction proceedings." (citation omitted)). This Court previously has affirmed findings of no prejudice where, as here, (1) the

52

new mitigation evidence did not establish any statutory mitigating factors, (2) the new mitigation evidence did not reduce the weight of the statutory aggravating factors, and (3) the jury had heard some non-statutory mitigation of the same type the new mitigation presented, just in less detailed form.  Boyd v. Allen, 592 F.3d 1274, 1297-1302 (11th Cir.), cert. denied, 131 S. Ct. 645 (2010); Robinson v. Moore, 300 F.3d 1320, 1346-48 (11th Cir. 2002); see also Rutherford, 385 F.3d at 1315-16 (finding state court's conclusion of no prejudice reasonable because (1) jury had heard some evidence of defendant's mental and emotional state, and evidence as to other possible non-statutory mitigating factors, from penalty phase witnesses, (2) new evidence would have come at cost of introducing damaging testimony, and (3) strong aggravating factors existed).

In sum, when we look at all the evidence in mitigation, both that presented at the penalty phase and in the 3.850 proceedings, together with the aggravating evidence in this case, we conclude that Rose has not carried his burden to show a reasonable probability that he would have received a different sentence had Rouson investigated and presented the evidence Rose contends he should have. Our confidence in the outcome has not been undermined.  Because Rose has not shown prejudice, we need not decide whether his trial counsel's penalty-phase performance was deficient.

53

## IV. CONCLUSION

For the reasons set forth above, we affirm the district court's denial of Rose's 28 U.S.C. § 2254 petition.

**AFFIRMED.**