[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12147

_____

D.C. Docket No. 3:13-cv-00119-TCB

WILLIE JAMES PYE,

Petitioner - Appellant,

versus

WARDEN, GEORGIA DIAGNOSTIC PRISON,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(April 27, 2021)

Before WILSON, MARTIN and JILL PRYOR, Circuit Judges.

JILL PRYOR, Circuit Judge:

Willie James Pye, incarcerated on Georgia's death row, appeals the district court's denial of his 28 U.S.C. § 2254 habeas petition. He seeks habeas relief on several grounds, including that his trial counsel provided ineffective assistance at the penalty phase of his capital trial. After careful review, and with the benefit of oral argument, we conclude that the district court erred in denying relief on this claim, so we reverse. We otherwise affirm the district court's judgment.[1]

## I.    BACKGROUND

Mr. Pye was convicted in Georgia of malice murder, kidnapping with bodily injury, armed robbery, burglary, and rape. The jury unanimously recommended a death sentence for the malice murder conviction, and the trial court accepted the recommendation. Below we recount the events that led to Mr. Pye's convictions and sentence, his state postconviction proceedings, and the course of his federal habeas proceedings.

---

[1] The district court correctly denied Mr. Pye relief on his claims that trial counsel provided ineffective assistance at the guilt phase of trial, the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose two prior inconsistent statements made by Mr. Pye's codefendant, Mr. Pye was denied his Sixth Amendment right to conflict-free counsel, and cumulative error deprived Mr. Pye of a fair guilt-phase trial. We affirm in those respects and do not discuss these claims further.

We also do not address the Georgia state court's conclusion that Mr. Pye is not intellectually disabled and therefore ineligible for the death penalty. We need not reach this issue because he is entitled to relief from his death sentence on his claim of ineffective assistance of counsel at the penalty phase of his trial, and this issue also "deal[s] with the penalty phase." *Cooper v. Sec'y, Dep't of Corr.*, 646 F.3d 1328, 1331 n.1 (11th Cir. 2011). And we do not address Mr. Pye's cumulative error claim as it pertains to the penalty phase because Mr. Pye has shown prejudice stemming from a single claim.

## A. Mr. Pye's Trial

The facts underlying Mr. Pye's convictions were described by the Supreme Court of Georgia on direct appeal. *See Pye v. State*, 505 S.E.2d 4, 9–10 (Ga. 1998). Mr. Pye had dated Alicia Lynn Yarbrough, the victim, on and off for some time. At the time of the murder, however, Ms. Yarbrough was living with another man, Charles Puckett, and their infant child. Mr. Pye and two companions, Chester Adams and Anthony Freeman, drove to the home of Ms. Yarbrough and Mr. Puckett, intending to rob Mr. Puckett. Mr. Pye also was upset that Mr. Puckett had signed the birth certificate of Ms. Yarbrough's child. When they arrived, Mr. Puckett was not home. Mr. Pye forcibly took Ms. Yarbrough from the home, leaving the infant behind. The three men rented a hotel room, where they each repeatedly raped Ms. Yarbrough. The men eventually took Ms. Yarbrough from the hotel room, put her into Mr. Adams's car, and left the hotel. At Mr. Pye's direction, Mr. Adams pulled the car onto a dirt road. Mr. Pye ordered Ms. Yarbrough out of the car, made her lie face down, and shot her three times, killing her. Mr. Pye was charged after Mr. Freeman confessed and implicated the other two men.

The trial court appointed Johnny B. Mostiler, the Spalding County public defender, to represent Mr. Pye. Mr. Mostiler, the sole attorney on Mr. Pye's

defense team, was assisted by investigator Dewey Yarbrough.[2]  While representing Mr. Pye, Mr. Mostiler represented thousands of other people charged with felonies and misdemeanors and maintained an active private civil practice.  He was representing four other capital defendants during his representation of Mr. Pye. According to his billing records, Mr. Mostiler spent just over 150 hours preparing for Mr. Pye's trial.

At the guilt phase of his trial, the State presented several witnesses, including Mr. Freeman, who discussed Mr. Pye's involvement in the crime.  Mr. Pye, who maintained his innocence despite the evidence against him, testified in his own defense.  A jury found him guilty.

At the penalty phase, the State presented testimony from three witnesses. Kimberly Blackmon, Ms. Yarbrough's niece, testified about an argument she saw between Ms. Yarbrough and Mr. Pye in which Mr. Pye threatened Ms. Blackmon, her mother, and Ms. Yarbrough with a gun; fired the gun toward Ms. Blackmon; and struck Ms. Yarbrough, who was pregnant at the time, in the back with the gun. Through Ms. Blackmon, the State presented photos of Ms. Yarbrough's three children.  Griffin Police Department Corporal Timothy Trevillion testified that he had responded to a call the police received regarding the incident Ms. Blackmon described.  Georgia Bureau of Investigation official Sam House, a former field

---

[2] Mr. Yarbrough is not related to the victim.

4

agent, testified that Mr. Pye was arrested and charged with burglary in 1984—about a decade before the murder—and at that time had a reputation within the community for violence.

Trial counsel presented testimony from eight lay witnesses: Mr. Pye's sister Pam Bland, sister Sandy Starks, brother Ricky Pye, father Ernest Pye, 15-year-old niece Cheneeka Pye, nephew Dontarious Usher, sister-in-law Bridgett Pye, and family friend Lillian Buckner. These witnesses testified to Mr. Pye's good moral character and asked the jury for mercy. Some said Mr. Pye and Ms. Yarbrough seemed to have a good relationship.

Mr. Mostiler asked a couple of the witnesses about Mr. Pye's early life. He asked Ms. Bland "how big a house" the family lived in growing up, and Ms. Bland testified that the family "had a four-bedroom" home. Doc. 13-11 at 30.[3] Ms. Starks testified that she and her siblings "came up in a household where we didn't have the things like a lot of people had." *Id.* at 67. She testified that the family had no "running water in the bathroom" or central heat (they had "a wooden heater" instead), but, she said, "one thing we did have, we had love, if we didn't have nothing else." *Id.* Five of the eight witnesses told the jury they did not believe Mr. Pye was guilty.

---

[3] "Doc." numbers refer to the district court's docket entries.

In closing, the prosecutor, William McBroom, "went back to the last death penalty case [he and Mr. Mostiler] had and . . . saw what the arguments that he made on that were." *Id.* at 83. From there, he told the jury what he "anticipate[d]" Mr. Mostiler would argue. *Id.* He anticipated Mr. Mostiler would quote from William Shakespeare's *The Merchant of Venice*, "the quality of mercy is not strained," and from the Bible's Beatitudes, "blessed are the merciful for they shall obtain mercy." *Id.* Mr. McBroom told the jury:

> [T]here's one thing that I fear more than anything else in this case, that if you give him life without parole, if he killed a woman on a dirt— lonely, dirt road, that he loved, he'll for sure kill a guard to get out. And if he ever has the chance and a guard stands between him and freedom, you know what he'll do. And what I fear in this case is you read—pick up the paper and you see where he's killed some guard and you try to think this, I wish I could have done something when I had the chance. He is going to be a danger to everybody around him until the day he is executed. Now, I'm sorry, but that is a cold, hard fact.

*Id.* at 86–87. Mr. McBroom also set a timer for five minutes, sat in silence, and explained that Ms. Yarbrough had suffered for longer than that after being shot.

Mr. Mostiler asked the jury to have mercy on Mr. Pye and suggested that Mr. Pye had never been violent except against Ms. Yarbrough. He acknowledged that he and Mr. McBroom had "faced off against each other in several death penalty cases," and then—just as Mr. McBroom predicted—he quoted from *The Merchant of Venice* and the Beatitudes. *Id.* at 91–94. Of Mr. McBroom's argument that Mr. Pye would kill a prison guard, Mr. Mostiler said, "Willie James

Pye is not a danger to you, he's not a danger to me, he's not a danger to a prison guard." *Id.* at 93–94.

The jury found the following statutory aggravating circumstances in support of the death penalty:  the murder was committed while Mr. Pye was engaged in the commission of (1) kidnapping with bodily injury, (2) rape, (3) armed robbery, and (4) burglary.  The jury recommended a sentence of death, and the trial court imposed that sentence.[4]  On direct appeal, the Supreme Court of Georgia affirmed, and Mr. Pye's petition for a writ of certiorari to the Supreme Court of the United States was denied.  *See Pye*, 505 S.E.2d at 4, *cert. denied*, 526 U.S. 1118 (1999).

## B. State Habeas Proceedings

Mr. Pye timely petitioned for a writ of habeas corpus in Butts County Superior Court.  He asserted, among other claims, that Mr. Mostiler was ineffective for failing to investigate and present mitigating evidence at the penalty phase of his trial, including evidence of his family background and cognitive impairment, as well as evidence to "counter the State's evidence of aggravated culpability." *Rompilla v. Beard*, 545 U.S. 374, 380–81 (2005).

---

[4] The court also sentenced Mr. Pye to three terms of life imprisonment for kidnapping with bodily injury, armed robbery, and rape, and 20 years' imprisonment for burglary, all to be served consecutively.  Nothing we hold today disturbs those sentences.

7

###### i.    The Evidentiary Hearing

The state habeas court held an evidentiary hearing on Mr. Pye's petition. Mr. Mostiler was deceased by then, but habeas counsel offered for admission into evidence his case file and billing records, which included one hour for meetings with each of two of Mr. Pye's brothers, one and a half hours the day before the penalty phase began to "[d]iscuss mitigation with family," and one hour the day of the penalty phase for a "[f]inal interview with family witnesses." Doc. 19-11 at 78–79.

Mr. Yarbrough testified about the defense team's work on Mr. Pye's case. He testified that the primary focus of the defense was to prove Mr. Pye's innocence. He did not recall Mr. Mostiler's mitigation strategy, whether the team received school records, or whether they pursued leads about any mental health issues. He acknowledged that despite it being Mr. Mostiler's general practice to do so, the defense obtained no independent psychological evaluation of Mr. Pye. Mr. Yarbrough recalled discussing Mr. Pye's childhood "a little bit," including by asking Mr. Pye questions about where he and his family lived, how many family members there were, "how they were raised, how they were living at the time, mostly how things were at that particular time with the family." Doc. 19-11 at 22. He acknowledged visiting Mr. Pye's home, which had "no water, no electricity"— facts that left Mr. Yarbrough "a little amazed" by "the sad situation in the home."

*Id.* at 22–23; Doc. 14-41 at 75.  Mr. Yarbrough testified that Mr. Pye told him "to go out and contact his family members," and he contacted four or five of them, including Mr. Pye's mother, father, and two to three siblings.  Doc. 19-11 at 23.[5]

Mr. Yarbrough testified that the family "didn't put any effort forth on any of the contacts I made with them."  *Id.* at 24.  He recalled one family member saying "that [Mr. Pye] got himself into this, and he can get himself out of it."  *Id.*  When asked to explain how that affected the defense, Mr. Yarbrough clarified that the family was unhelpful "as far as helping prove [Mr. Pye's] innocence."  *Id.* at 25.  "I can remember thinking, and I want to say this was during, right before the sentencing phase, you know, I just don't care about going back over there and trying to get them here."  *Id.*  Mr. Yarbrough surmised that he spoke with other people, including neighbors of the Pye family, but he did not recall specifics.  He also testified that both he and Mr. Mostiler spent more time working on the case than their billing records reflected, although he did not specify the focus of those extra work hours.

---

[5] The state habeas court found that an entry in both Mr. Mostiler and Mr. Yarbrough's billing records for a meeting with "Mr. and Mrs. Robert Pye" instead referred to a meeting with Mr. and Mrs. Ernest Pye, Mr. Pye's parents.

Habeas counsel also offered undisputed evidence that Mr. Pye is of low intellectual functioning, bordering on intellectual disability.[6]  And they presented affidavit testimony from 27 affiants, 24 of whom testified about matters relevant to the penalty phase investigation and presentation.  The affiants described in detail Mr. Pye's traumatic childhood and adolescence, during which near-constant physical and emotional abuse, extreme parental neglect, endangerment, and abject poverty pervaded his daily life, as well as his resulting troubled adulthood.  The affiants included Mr. Pye's mother, six of his siblings,[7] nieces and nephew, teachers, school social worker/truancy officer, friends, family friends, neighbors, and corrections officers.  A police officer from the community in which Mr. Pye was raised also provided an affidavit.  Nearly every story in each account is corroborated by another affiant's account, and numerous details are corroborated by school records, Georgia Department of Corrections ("DOC") records, or other documentary evidence that habeas counsel introduced.  Every affiant expressed a willingness to testify to the details in their affidavits.

---

[6] Mr. Pye's primary witness on intellectual disability, Dr. Victoria Swanson, in fact testified that Mr. Pye is intellectually disabled.  The State's expert disputed her conclusion.  Even so, as the state habeas court explained, "[i]t is undisputed among the mental health professionals who have evaluated Petitioner that Petitioner's intellectual functions are in the low to borderline range."  Doc. 20-40:18.  Here, we focus on Mr. Pye's undisputed low intellectual functioning as a mitigating circumstance.

[7] Mr. Pye was one of 10 children in the Pye family.  One of his siblings was deceased at the time of the state habeas proceedings, and another is intellectually disabled.

The evidence submitted at the evidentiary hearing showed the following. Mr. Pye was born to Ernest Pye Sr. and Lolla Mae Pye. He was the seventh of 10 children born to Lolla Mae, and his challenges began before birth. Whether pregnant or not, Lolla Mae drank alcohol. When she was pregnant with Mr. Pye, Lolla Mae struggled as the sole provider for her six children. Ernest, whom people called "Buck," was incarcerated and working on a chain gang. Lolla Mae took whatever work she could get. She worked all the way up until Mr. Pye's birth and then resumed working immediately afterward.

Lolla Mae had to walk to her jobs from the family's two-room house, which had no running water, and the jobs "were not close by. She stayed gone from before the sun came up until late in the evening." Doc. 16-24 at 32. While she was gone, the older children (Randy, at about 10 years old, was the oldest) cared for the younger ones, including Mr. Pye, then just an infant. Lolla Mae's job paid very little, and "the little ones' milk had more water in it than milk." *Id.* at 90. The family primarily ate bread and gravy. They had no money for medical care.

Buck returned from the chain gang when Mr. Pye was about three years old, and the family moved to a nicer home with indoor plumbing. Their stay was short-lived, however, and when Mr. Pye was about five years old the family moved again, this time to a house in Indian Springs. Indian Springs was "where the poorest black families lived," and "[o]ut of the families in Indian Springs, the

11

Pye[s] were one of the worst off." *Id.* at 28–29. The Indian Springs home lacked heat and indoor plumbing and was in a constant state of disrepair. The family burned fires or used dangerous propane heaters to heat the house; used "a spout near the road" to get water for drinking, cooking, and bathing; and divided the house into rooms "using boards and sheets." *Id.* at 56, 108. The family crammed itself into the house: "whoever was the baby" at the time slept with Lolla Mae and Buck, the two Pye daughters shared a room, Randy slept on a couch in the hallway, and the rest of the Pye boys slept in one bed.

Worse, according to a police officer, "[t]he conditions were filthy and the rooms in total disarray every time we entered." *Id.* at 22. According to the school's social worker, who visited the home multiple times a week for years, "[t]he house was never clean; piles of filth, scraps and garbage were strewn everywhere." *Id.* at 62. He described the condition of the house as "deplorable." *Id.* at 61. On one visit, finding that "the small children had not been bathed and there was spoiled food sitting around," the social worker reported the conditions of the Pye home to the Department of Family and Children Services ("DFACS"). *Id.* at 62. Despite his concern that the home was "so unsanitary" that it created a risk to "the health of the children," DFACS did not intervene. *Id.*

As she had more children, Lolla Mae's health began to fail. She stopped working shortly after the family moved to Indian Springs and often would stay in

bed all day due to various ailments, including arthritis, asthma, high blood pressure, and "nerves." *Id.* at 38. She once had a debilitating asthma attack in front of Mr. Pye and his siblings. As she described it, "I couldn't breathe for several minutes and I nearly died. Everyone in the house was screaming and carrying on. It was very scary for us." *Id.* at 94. On the days Lolla Mae stayed in bed, the children were tasked with her care.

Lolla Mae continued to drink nonetheless, often leaving the children at home to visit a juke joint with friends. Buck—who drank steadily even before Mr. Pye was born—began to drink even more. Buck was notorious for his drinking, as well as his abusive behavior. Buck "would spend every cent [his] famil[y] had in bars and bootlegging houses, and then come home stinking drunk and mean."[8] *Id.* at 25–26. When he drank, he was verbally and physically abusive. "Beatings and tirades were [Buck's] only interaction with his children." *Id.* at 60.

Buck's verbal assaults were "downright cruel." *Id.* at 21. He "had no problem calling his wife and small children every foul expletive he could manage," carrying on "about how worthless the kids" and Lolla Mae were. *Id.* at 22. But "Willie definitely got the worst of his father's nasty comments." *Id.* at 26. Buck

---

[8] Buck spent the meager earnings he made from cutting down trees, Lolla Mae's meager wages, and the government assistance check the family received because of son Ernest Pye, Jr.'s disability. "It was general knowledge in the [community] that Junior . . . limped because his father hit him with a tire iron while he was still recovering from a broken hip and the hip never healed properly." Doc. 16-24 at 73.

"would tell Willie that he was so stupid that he just couldn't be his kid." *Id.* Buck would say "that Willie was born because [Lolla Mae] was messing around while he was in prison, and that he was sick of looking at a kid that belonged to some other guy." Doc. 16-25 at 2. Buck "would tell the rest of [the Pye] kids that there was stuff wrong with Willie James, and that [they] shouldn't pay attention to him, all with Willie standing right in front of him." *Id.*

Unfortunately, Buck's abuse did not stop at words. He was extremely physically violent, and "calls [to police] about violence in the Pye home were constant." Doc. 16-24 at 20. He "beat the devil out of [the] children," *id.* at 60, and again, "Willie definitely got the worst of [those] violent outbursts," *id.* at 26. Buck also would hit Lolla Mae and throw things at her, all in front of the children. On at least one occasion he attacked Lolla Mae with a knife; on another occasion he hit her over the head with a bottle. When Buck hit her with a bottle "[t]here was blood from her head everywhere and [the children] all freaked out"; the wound required stitches. *Id.* at 36. Lolla Mae responded to Buck's violence in kind, sometimes with a knife. She, too, beat the children. The school social worker counseled Lolla Mae about the abuse, but nothing changed.

Sometimes when their parents fought, the children would try to break up the fight. As the older boys reached their teenage years, though, they too began to drink heavily and engage in physical violence, beating their father when he was

14

drunk and abusive. When police responded to calls at the Pye house, what they found "was absolute chaos," *id.* at 20, with brawling between Mr. Pye's parents and older siblings. For their part, "[t]he younger kids would head for the hills when the fighting started," often hiding in a clearing in the woods near the home. *Id.* at 22.

Mr. Pye, unlike his older brothers, was not violent. As a young boy, he was among the children who hid from his family's explosive violent episodes. As he got older, he tried to play the role of peacemaker, "pull[ing] [his] parents apart" when they fought. *Id.* at 36. In response, Buck would "blast Willie right across the head and he'd go flying." Doc. 16-25 at 2. Mr. Pye "took the comments about not belonging to [his] father hard." *Id.* "He was quieter and took things to heart. The most important thing to Willie was to be like everyone else, and [Buck] was constantly telling him that he wasn't." *Id.* When he got upset, Mr. Pye "would find any place he could . . . be alone—the bed, the woods, under the porch. Then he'd lie down and curl up and just stare at nothing." *Id.* If a sibling tried to talk to him, he would act like no one was there. *Id.*

Nearly all of the Pye children, Mr. Pye included, struggled to attend school and to perform academically when they did. The children did not attend school sometimes "because they were embarrassed that they were behind academically or that their clothing was second-hand." Doc. 16-24 at 63. Mr. Pye was teased for

both. "Much of the time, however, the problem was very basic: the children didn't leave the bed and get on the bus because it was cold. The home had no heat and no one got up early to make a fire." *Id.* And no one made them go. When Mr. Pye managed to attend school, he was enrolled in "Title I" classes, which were "designed to target socially and educationally at-risk children who were performing significantly below grade level." *Id.* at 45. Mr. Pye "tried hard," but "he just never did grasp most of the operations" the classes covered. *Id.* at 46. Toward the end of junior high, Mr. Pye dropped out—he "finally got so far behind the rest of [his peers] and so frustrated that it made more sense for him to stop going." *Id.* at 29. Mr. Pye's school records corroborate his low attendance, academic challenges despite effort (including standardized test scores placing him in the lowest one percentile nationally in reading and language), general lack of family support, and completion only of eight years of schooling.

Mr. Pye received little support at school and even less support at home. He also received virtually no support from other community members. Mr. Pye, like his siblings, was ostracized by members of the community because of the family's reputation for poverty, alcoholism, and violence. Even as he reached adulthood, Mr. Pye continued to experience "long, quiet depressed times" when he "wasn't himself"—he "didn't talk, didn't interact with other people," and "would go off somewhere to be alone." *Id.* at 79–80, 103.

16

Mr. Pye endured hardship and trauma beyond his early years. When he was about 20 years old, he was convicted of burglary and sentenced to five years in prison. The environment in which Mr. Pye was incarcerated was dangerous. "New inmates could be expected to be terrorized upon arrival by the guys that were already there. Most were either physically or sexually assaulted, or both." *Id.* at 50. Mr. Pye, "a smaller guy," was considered by prison staff "to be at risk for victimization." *Id.* at 70.

DOC records from Mr. Pye's 1985 incarceration, which trial counsel did not attempt to obtain, corroborate that corrections officials considered Mr. Pye to be at risk of victimization. DOC's "Consulting Psychologist" evaluated Mr. Pye shortly after he arrived at the prison. She opined that Mr. Pye was "very weak," "confused," and "vulnerable," and suggested that he may need "protective placement." Doc. 15-19 at 9, 11. The records also document corrections officials' impressions that Mr. Pye was generally trustworthy and not an escape or safety risk. The psychologist opined that Mr. Pye was "[n]ot likely to be violent or potentially dangerous" and was "very unlikely to become a predator"; she found "[n]o evidence of escape." *Id.* A psychological report indicated that Mr. Pye "should be able to adapt to average security arrangements." *Id.* at 15. And adapt he did. During his time in prison, despite his challenges, Mr. Pye made a notably positive impression on prison staff. Guards regarded Mr. Pye as "completely

17

respectful . . . in a way that most of the inmates were not." Doc. 16-24 at 49. "He was never menacing, never made any threatening remarks, never did anything but joke around and take care of his assigned work." *Id.* Guards had "no reservations about [Mr. Pye] working throughout the dorm area, even during times when he was not closely supervised." *Id.* at 71. He helped the guards "keep the rest of the unit safe" by disclosing knowledge of other prisoners' weapons or plans for disruption. *Id.* at 49.

In addition to his adaptability to prison, Mr. Pye's DOC records from his previous incarceration thoroughly document his severe depression. The consulting psychologist indicated that Mr. Pye "was very depressed when he entered [the prison]." Doc. 15-19 at 11. Mr. Pye's psychological report stated that his depression was "severe enough to suggest consideration of [psychopharmacological therapy]," as well as "special counseling." *Id.* at 15–16; *see id.* at 13 (opinion of consulting psychologist the Mr. Pye should receive "more counseling than the average" because of his depression). The psychologist opined that Mr. Pye may be coping with his depression "by emotional withdrawal" and that he seemed "unstable," reported hearing voices, and was "very homesick." *Id.* at 12. (In fact, when Mr. Pye left prison in 1990 his depressive episodes continued and, by some accounts, worsened.)

Mr. Pye's low intellectual functioning is also well-documented in the records.  The counseling psychologist noted that although Mr. Pye expressed an interest in learning, "[i]ntellectually, he is probably in the low average range but his test scores are significantly lower." *Id.* at 13.  For example, he was reading and writing at a fourth-grade level.  She opined that Mr. Pye "may need special ed help, probably in the learning disabled area." *Id.* at 11.[9]  Because trial counsel did not obtain the records, his defense strategy could not account for the information in them.

Nor had trial counsel contacted most of the affiants whose testimony habeas counsel presented.  Some were not contacted even though they knew Mr. Mostiler or Mr. Yarbrough or had attended the guilt phase of the trial.

Mitigation witnesses who had some interaction with the defense team before the penalty phase began explained how limited that contact was.  In his affidavit, Mr. Pye's younger brother Ricky, who had testified at trial, recounted Mr. Yarbrough's visit to the family's house.  Mr. Yarbrough "talked to my dad about the charges against Willie.  He didn't ask about Willie James and how he came up, or how we all were raised.  [Mr. Yarborough] never spoke to me about those things."  Doc. 16-24 at 99; *see id.* at 100 ("We had it real tough growing up and

---

[9] DOC records showed that Mr. Pye asked to be given job training for barbering but failed the aptitude test for it.  The record stated that Mr. Pye "[a]ppears to need educational upgrading and adjustment prior to retesting."  Doc. 15-19 at 14.

Mr. Mostiler and Dewey never asked about that."). Ms. Bland, who also had testified at trial, reported that she was contacted by Mr. Yarbrough a "week or two before the trial started," at which point he asked her to find witnesses who may testify to Mr. Pye's good character. *Id.* at 39. Despite the short notice, she tried to locate people who could help. Because of *her* efforts, Cheneeka Pye, Sandy Starks, Ricky Pye, Dontarious Usher, and Lillian Buckner testified. Ms. Bland, Ricky, and the other witnesses who had testified at trial explained at the evidentiary hearing that although they met with a member of the defense team for a few minutes before their testimony—a meeting corroborated by Mr. Mostiler's billing records—they were asked no specific questions about Mr. Pye or his background and were not told what kind of evidence would be mitigating other than to say "nice" things about him. Doc. 16-24 at 78. The record reflects that during the motion for new trial proceedings Mr. Yarborough admitted to the Office of Multicounty Public Defender[10] that the defense team "made a big mistake by not talking to Willie's oldest sister [Sandy Starks] before putting her on the stand during sentencing." Doc. 17-9 at 89.

---

[10] This office is now known as the Office of the Georgia Capital Defender. *See* O.C.G.A. § 17-12-121.

## ii.    The State Habeas Court's Order

The state habeas court denied Mr. Pye's habeas petition, concluding that he failed to show his counsel was deficient or that the deficiency prejudiced him.  As to deficient performance, the court decided that Mr. Pye's "family members were not helpful to the[] investigation" and were "generally unwilling to cooperate in [Mr. Pye's] defense."  Doc. 20-40 at 58–59.  Even so, the court found, Mr. Mostiler asked Mr. Pye questions about his background, made requests for school records, and interviewed some family members.  The court emphasized that Mr. Mostiler's case file contained notes indicating that Mr. Pye had no military or psychiatric history and that there was nothing to suggest Mr. Pye had suffered serious illness or major traumas.  The court pointed to two entries in counsel's time records showing he spoke with Mr. Pye's family.  The court therefore concluded that defense counsel's investigation was reasonable.

As to prejudice, the court found that evidence of low intellectual functioning would not have swayed the jury.  The court noted affidavit testimony that rebutted the State's contention of future dangerousness but emphasized that Mr. Pye's corrections records showed several instances of "mouthing off" to or ignoring officers, including one instance that required officers to forcibly restrain him.  The court thus found no reasonable probability that Mr. Pye's resulting sentence would

21

have been different had the jury heard testimony like that of the two prison guards who provided postconviction affidavits.

With respect to Mr. Pye's family background, the state habeas court explained that trial counsel "did learn, to some extent, of the family's impoverished circumstances, and presented those facts to the jury through [Mr. Pye's] sisters." *Id.* at 64 (citation omitted). The court also "reviewed [Mr. Pye's] affidavit evidence with caution." *Id.* at 66. First, it observed that the existence of affidavits in postconviction proceedings "usually proves little of significance." *Id.* at 65 (quoting *Waters v. Thomas*, 46 F.3d 1506, 1513–14 (11th Cir. 1995)). Second, the court found that three of the mitigation affidavits "were misleading." *Id.* at 65. Regarding the first of these affidavits, "Curtis Pye testified . . . 'No one talked to me . . . before [Mr. Pye's] trial. Johnny Mostiler and his assistant Dewey [Yarborough] know me . . . He didn't get in touch with me.'" *Id.* at 65 (purporting to quote Curtis Pye's affidavit). "However, Mr. Mostiler's billing records in Petitioner's case reflect that Mr. Mostiler interviewed Curtis Pye for one hour approximately one month prior to trial." *Id.* In the second affidavit, "Ricky Pye testified . . . 'I never spoke to Mostiler about what to say [at trial], and he didn't meet with me or ask me any questions before my turn for testimony.'" *Id.* at 66 (quoting Ricky Pye's affidavit). But "[t]he affidavit makes no mention of Mr. Mostiler's one hour interview with him, also approximately one month prior to

trial." *Id.*  Finally, although Lolla Mae testified in the third affidavit that "[n]o one took the time to talk to me about all [sic] anything before Willie's trial," Mr. Yarbrough's testimony and Mr. Mostiler's billing records showed otherwise.  *Id.*[11]

The court found "little, if any, connection between [Mr. Pye's] impoverished background and the premeditated and horrendous crimes in this case." *Id.*  It further determined that because Mr. Pye "was 28 years old at the time of these crimes, trial counsel could have reasonably decided, given the heinousness of this crime and the overwhelming evidence of [Mr. Pye's] guilt, that remorse was likely to play better than excuses." *Id.*  Thus, the court found no prejudice stemming from counsel's performance.

Georgia's Supreme Court denied Mr. Pye a certificate of probable cause to appeal the state habeas court's order.

### C. Federal Habeas Proceedings

After he exhausted his state appeals, Mr. Pye filed a petition for a writ of habeas corpus in federal district court, raising several claims including his penalty-

---

[11] The state habeas court also noted—accurately—that Mr. Lawson's affidavit was "corrected through additional affidavit testimony." Doc. 20-40 at 65.  Mr. Lawson initially testified that he observed Ms. Pye drunk while pregnant, but later corrected his testimony to say he "had no direct knowledge" that she drank while pregnant.  Doc. 20-6 at 17–18.

The court further observed that Mr. Pye's codefendant Mr. Adams's affidavit "contain[ed] multiple material inconsistencies when compared to his video-taped statement" made to police in the hours after the murder.  Doc. 20-40 at 66.  The court was correct in this observation as well.  Mr. Adams testified to guilt-phase issues, however; thus, his affidavit is not material to the penalty-phase prejudice analysis.  And even if it was, there is no indication from the record that the reliability issues with Mr. Adams's affidavit pervaded the other affidavits.

phase ineffective assistance of counsel claim.  The district court, focusing primarily on prejudice, rejected the petition but granted Mr. Pye a certificate of appealability on the claim.  This is Mr. Pye's appeal.

## I.    STANDARD OF REVIEW

"When reviewing a district court's grant or denial of habeas relief, we review questions of law and mixed questions of law and fact *de novo*, and findings of fact for clear error."  *Reaves v. Sec'y, Fla. Dep't of Corr.*, 717 F.3d 886, 899 (11th Cir. 2013) (internal quotation marks omitted).  An ineffective assistance of counsel claim "presents a mixed question of law and fact that we review *de novo*."  *Pope v. Sec'y, Fla. Dep't of Corr.*, 752 F.3d 1254, 1261 (11th Cir. 2014).

Because the state habeas court decided Mr. Pye's ineffective assistance of counsel claim on the merits, we must review that court's decision under the highly deferential standards set by Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  *See Wilson v. Sellers*, 138 S. Ct. 1188, 1191–92 (2018).  AEDPA bars federal courts from granting habeas relief to a petitioner on a claim that was adjudicated on the merits in state court unless the relevant state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented
in the State court proceeding.

28 U.S.C. § 2254(d). "'[C]learly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). A state court's decision "involves an unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 407, 413. "[A]n unreasonable application . . . must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

With respect to § 2254(d)(2), "[s]tate court fact-findings are entitled to a presumption of correctness unless the petitioner rebuts that presumption by clear and convincing evidence." *Conner v. GDCP Warden*, 784 F.3d 752, 761 (11th Cir. 2015). "This deference requires that a federal habeas court more than simply

25

disagree with the state court before rejecting its factual determinations." *Rose v. McNeil*, 634 F.3d 1224, 1241 (11th Cir. 2011). "Instead, it must conclude that the state court's findings lacked even fair support in the record." *Id.* Even so, "deference does not imply abandonment or abdication of judicial review," nor does it "by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Id.*

"Deciding whether a state court's decision involved an unreasonable application of federal law or was based on an unreasonable determination of fact requires the federal habeas court to train its attention on the particular reasons— both legal and factual—why [a] state court[] rejected a state prisoner's federal claims, and to give appropriate deference to that decision." *Wilson*, 138 S. Ct. at 1191–92 (citation and internal quotation marks omitted); *see also Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021). If "a federal court determines that a state court decision is unreasonable under § 2254(d)," it is "unconstrained by § 2254's deference and must undertake a *de novo* review of the record." *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1260 (11th Cir. 2016) (internal quotation marks omitted); *see also Cooper v. Sec'y, Dep't of Corr.*, 646 F.3d 1328, 1353 (11th Cir. 2011) ("When a state court unreasonably determines the facts relevant to

26

a claim, we do not owe the state court's findings deference under AEDPA, and we apply the pre–AEDPA *de novo* standard of review to the habeas claim." (internal quotation marks omitted)).

### III.   DISCUSSION

Mr. Pye claims that his trial counsel was ineffective in failing to investigate and present evidence about his traumatic childhood and adolescence, mental health problems, and low intellectual functioning.  He also claims that his counsel failed to investigate and present evidence to rebut the State's claim of future dangerousness.  And, he argues, there is a reasonable probability that, had the jury heard this evidence, it would have recommended a sentence other than death.

Under *Strickland v. Washington*, a defendant has a Sixth Amendment right to effective assistance of trial counsel.  466 U.S. 668, 686 (1984).  Counsel renders ineffective assistance, warranting vacatur of a conviction or sentence, when his performance falls "below an objective standard of reasonableness," taking into account prevailing professional norms, and when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 688, 694.

As to deficient performance, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  "To overcome that presumption, [Mr. Pye] must show that

27

counsel failed to act reasonably considering all the circumstances." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (alteration adopted and internal quotation marks omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," but, importantly, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. The Supreme Court has cautioned that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

To establish prejudice, Mr. Pye "need not show that counsel's deficient conduct more likely than not altered the outcome in the case"; he need only show a reasonable probability of a different outcome. *Id.* at 693. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In determining whether there is a reasonable probability of a different result, "we consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (alteration in original) (quoting *Williams*, 529 U.S. at 397–98).

28

Because AEDPA applies to the state habeas court's decision, Mr. Pye is "entitled to relief only if the state court's rejection of his claim of ineffective assistance of counsel was 'contrary to, or involved an unreasonable application of,' *Strickland*, or rested on 'an unreasonable determination of the facts in light of the evidence in the State court proceeding.'" *Id.* at 39 (quoting 28 U.S.C. § 2254(d)). "Federal courts may not disturb the judgments of state courts unless each ground supporting the state court decision is examined and found to be unreasonable." *Shinn v. Kayer*, 141 S. Ct. 517, 524 (2020) (emphasis omitted) (internal quotation marks omitted). "Thus, if a fairminded jurist could agree with either [the state court's] deficiency or prejudice holding, the reasonableness of the other is beside the point." *Id.* (internal quotation marks omitted).

The district court reviewed the state habeas court's decision through the lens of AEDPA deference. Focusing its analysis "primarily" on prejudice, Doc. 68 at 26, the court concluded that the state court's decision withstood deference. For the reasons below, we disagree. But because Mr. Pye is not entitled to habeas relief unless he also can show that counsel performed deficiently and that the state habeas court's decision otherwise was unreasonable, we start there.

## A. Deficient Performance

Mr. Pye contends that his trial counsel failed to undertake a basic mitigation investigation, ignored signs that further investigation would prove fruitful, and

29

failed entirely to attempt to rebut what counsel knew the State would present in aggravation.  We first decide whether the state court's rejection of Mr. Pye's argument withstands AEDPA deference.  Because it does not, we then conduct a *de novo* review of *Strickland*'s deficient performance prong.  *See Kayer*, 141 S. Ct. at 523–24 (admonishing that courts must first subject state court merits determinations to review under AEDPA and then, only if the court's error lies beyond any fairminded disagreement, proceed to conduct a *de novo* review).

### i.  AEDPA Analysis

Again, in rejecting Mr. Pye's ineffective assistance of counsel claim, the state habeas court concluded that trial counsel was not deficient because he asked Mr. Pye questions about his background, requested school records, and interviewed some family members despite his family's "unwilling[ness] to cooperate" in Mr. Pye's defense.  Doc. 20-40 at 58–59.  In support of its decision about deficient performance, the state habeas court pointed to Mr. Mostiler's case file, in which he noted that Mr. Pye had no military or psychiatric history and no indication of serious illness or major traumas, and Mr. Mostiler's time records, which showed he met with family members.  We conclude, however, that the state habeas court's decision involved an unreasonable application of clearly established law and rested on an unreasonable determination of the facts in light of the state court record.

As a preliminary matter, the state habeas court's factual premise that Mr. Pye's family members were uncooperative in the mitigation investigation—from which the court surmised that Mr. Mostiler did what he could with what little he had—was unreasonable in light of the record. The fact that seven of Mr. Pye's family members testified at the penalty phase conclusively disproves that the entire family was uncooperative. Every family-member affiant testified under penalty of perjury that he or she would had been willing to speak to the defense team before trial, and nothing in Mr. Yarbrough's testimony called those affidavits into question in that respect. Although Mr. Yarbrough testified that the family members were uncooperative, when asked to elaborate he clarified that they were unhelpful in the investigation of Mr. Pye's *innocence defense*, not in the investigation of mitigating circumstances (which counsel barely inquired about). Mr. Yarbrough asked Ms. Bland to corral potential penalty-phase witnesses a mere two weeks before the trial began. By his own testimony, he didn't "care" about trying to get Mr. Pye's family members to testify. Doc. 19-11 at 25. There is no "fair support in the record" for the state habeas court's sweeping statement that Mr. Pye's family refused to cooperate, *Rose*, 634 F.3d at 1241; thus, we do not defer to that finding.

The remaining weight of the state habeas court's determination that Mr. Mostiler's performance was not deficient—that he performed a reasonable

investigation—rested primarily on Mr. Mostiler's file notes in which he concluded that Mr. Pye had no military or psychiatric history and no indication of serious illness or major traumas. But counsel's conclusion does not answer whether his investigation to arrive at that conclusion was reasonable; it simply begs the question. The state habeas court unreasonably applied *Strickland* and its progeny by taking counsel's conclusions as evidence that the investigation supporting those conclusions was reasonable. *See Wiggins v. Smith*, 539 U.S. 510, 526–27 (2003) ("In rejecting petitioner's ineffective assistance claim, the [state court] appears to have assumed that because counsel had *some* information with respect to petitioner's background . . . they were in a position to make a tactical choice not to present a mitigation defense. In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." (citation omitted)).

"Even assuming [trial counsel] limited the scope of [his] investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy." *Id.* at 527. "Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy." *Id.* It is undisputed that Mr. Mostiler met with some of Mr. Pye's family members. The fact that the meetings occurred,

32

however, is not enough to show that Mr. Mostiler's investigation was reasonable. It is not enough in light of the wealth of evidence in the record from Mr. Yarbrough and Mr. Pye's family members—including siblings Sandy Starks, Pam Bland, Curtis Pye, and Ricky Pye; niece Cheneeka Pye; and nephew Dontarious Usher—that those meetings focused on Mr. Pye's innocence defense rather than potential penalty phase mitigation. To the contrary, Mr. Pye's family members recounted in their affidavits that when Mr. Mostiler and Mr. Yarbrough touched on potential mitigation evidence during a meeting, they asked no searching questions and failed to explain to family members the significance of certain facts as mitigating circumstances. Contemporaneous documentary evidence corroborates these accounts. When viewed in context, the mere fact that Mr. Mostiler met with some members of Mr. Pye's family does not support the conclusion that the investigation was reasonable. The state habeas court's decision otherwise involved an unreasonable application of clearly established federal law regarding the reasonableness of the mitigation investigation. *See id.*

The state habeas court reached the conclusion that counsel's meetings with family members amounted to an adequate investigation in part because it discredited the affidavit testimony of Curtis, Ricky, and Lolla Mae Pye regarding these family members' contacts with the defense team. Doc. 20-40 at 66. The court's factual determinations as to each of these affidavits were, however,

33

unreasonable in light of the factual record.  In concluding that Curtis had apparently lied in his affidavit about his contact with Mr. Mostiler, the state habeas court omitted (with ellipses) a key portion of testimony.  Curtis did not testify that no one talked to him before Mr. Pye's trial—the lie the state habeas court purported to identify—rather, he testified that "[n]o one talked to me *about any of this* [information about the family and Mr. Pye's upbringing] before Willie James's trial. . . .  [Mr. Mostiler] didn't get in touch with me *or ask me any questions about the house Willie James was raised in or what he was like as a child*."  Doc. 16-24 at 83 (emphasis added).  No reasonable factfinder would have drawn the conclusion the state habeas court drew given the totality of Curtis's testimony.

The state habeas court discredited Ricky's testimony for a similar unsubstantiated reason.  The court faulted Ricky for failing to mention his one-hour meeting with Mr. Mostiler about a month before trial when he testified that "[n]o one talked to me about my testimony before I went.  I never spoke to Mr. Mostiler about what to say, and he didn't meet with me or ask me any questions before my turn for testimony."  *Id.* at 99.  It is clear from this quote, however, that Ricky meant Mr. Mostiler did not meet with him to discuss his "testimony" before he testified at the penalty phase.  Looking at the quote in the context of his entire affidavit removes any doubt that it concerned Mr. Mostiler's failure to discuss Mr. Pye's family background with him.  Ricky testified in his affidavit that "[w]e had it

34

real tough growing up and Mr. Mostiler and Dewey never asked about that." Doc. 16-24 at 100. (Here he seems to be acknowledging rather than denying the meeting the state habeas court referenced because Mr. Mostiler and Mr. Yarbrough both were present at that one-hour meeting.) He also recounted a time when Mr. Yarbrough visited the family's home but "didn't ask about Willie James and how he came up, or how we were all raised." *Id.* at 99. There is simply no evidence in the record that Mr. Mostiler's meeting with Ricky a month before trial concerned this kind of potential mitigating evidence or Ricky's penalty-phase testimony. The state habeas court's decision to discredit Ricky's affidavit lacks fair support in the record, and so we do not defer to it. *Rose*, 634 F.3d at 1241.

The same is true for the state habeas court's rejection of Lolla Mae's affidavit. Her affidavit contains an apparent typographical error: she testified that "[n]o one took the time to talk to me about *all anything* before Willie's trial." Doc. 16-24 at 97 (emphasis added). The court interpreted her statement to mean that she was never contacted by the trial team—a fact refuted by Mr. Mostiler's billing records and Mr. Yarbrough's testimony. But the next three sentences in her affidavit leave no room for doubt that Lolla Mae meant she was never asked about mitigating circumstances:

> Nobody ask me all about how I grew up, how I came to be married to Ernest, and how I raised Willie and my other children. I would have been willing to talk about my life with Willie James's lawyer or investigator, or with any doctor or psychologist working on his case. I

35

would have told about all the things I described here, and testified to the jury about them if they wanted me to.

*Id.* The state habeas court's reading of the affidavit is entirely divorced from context. We do not defer to it. *Rose*, 634 F.3d at 1241.

The state habeas court's deficient performance analysis was based on an error in the application of *Strickland* and its progeny that is "beyond any possibility for fairminded disagreement." *Kayer*, 141 S. Ct. at 520 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). And the factual underpinnings of the court's decision are completely lacking in support from the record. For these reasons, we conclude that the state habeas court's deficient performance decision is not entitled to deference under AEDPA.

### ii. *De Novo* Review

Because the state habeas court's decision involved an unreasonable application of *Strickland* and was unreasonable in light of the factual record, "we are unconstrained by § 2254's deference and must undertake a *de novo* review of the record" to decide whether trial counsel's performance was deficient. *Daniel*, 822 F.3d at 1260. And the state habeas court did not reach the issue of whether trial counsel was deficient for failing to rebut the State's future-dangerousness case (deciding that issue on prejudice alone), so we conduct a *de novo* review of that aspect of Mr. Pye's claim as well.

36

On a *de novo* review, we have little trouble concluding that trial counsel was deficient.[12]  "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  "In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527.  Here, counsel knew little given the cursory investigation he undertook—speaking briefly with a few family members, possibly obtaining school records, and once visiting the family's home.  Even given the limited quantum of evidence counsel knew, however, reasonable counsel would have investigated further.  Because Mr. Mostiler, overwhelmed with an enormous caseload, ceased his investigation at an "unreasonable juncture," *id.*, we conclude that his performance at Mr. Pye's trial was deficient.

Trial counsel effectively outsourced the mitigation investigation to one of Mr. Pye's sisters, Ms. Bland.  He did so too late and with virtually no instruction. Mr. Yarborough testified that Mr. Pye asked trial counsel to contact his family in

---

[12] We disagree with the district court's suggestion that Mr. Mostiler's death "works to [Mr. Pye's] disadvantage."  Doc. 68 at 36.  Although the absence of trial counsel's testimony certainly can work to a petitioner's disadvantage, it does not in cases such as this one, where the record is well-developed as to counsel's actions.

search of potential mitigating evidence. Yet neither Mr. Mostiler nor Mr. Yarbrough meaningfully interviewed family members about mitigation. In fact, Mr. Yarbrough—to whom Mr. Mostiler had delegated investigative responsibilities—testified that he effectively gave up on the effort before sentencing. Rather than undertaking the investigative effort himself, Mr. Yarbrough tasked Ms. Bland with finding potential mitigation witnesses only a week or two before trial. He did so without informing her what types of mitigating evidence may be compelling to the jury, and without allowing her adequate time to find people who would testify. When Ms. Bland secured several family members and one family friend to testify, neither Mr. Yarbrough nor Mr. Mostiler inquired into what the witnesses knew so that Mr. Mostiler could elicit testimony that might sway the jury to recommend a penalty of life imprisonment rather than death. This, simply put, was deficient.

Even though trial counsel conducted only the most cursory of investigations, he knew enough to know he should have dug deeper. Mr. Mostiler failed to obtain a mental health evaluation of Mr. Pye despite it being his usual practice to do so. Had he followed his usual practice, he would have discovered Mr. Pye's borderline intellectual functioning. His low intellectual functioning also was apparent from his school records. The record does not reveal conclusively whether Mr. Mostiler had Mr. Pye's school records before the start of the penalty phase, but whether or

not he did, counsel's deficiency is clear. If counsel had gotten the records, he would have known that Mr. Pye was chronically absent from school and performed poorly—in some instances in the lowest one percentile—when he did attend. Further investigation would have revealed that Mr. Pye is of borderline intellectual functioning and was severely neglected during his school-age years. Mr. Mostiler would have discovered the names of teachers who could have been called to testify about Mr. Pye's struggles in school. But Mr. Mostiler followed none of the leads Mr. Pye's school records contained. Conversely, if counsel did not have the records, it was due to his too-late request for them: a mere ten days before voir dire began.

In addition to—or without—the school records, Mr. Mostiler had other evidence in hand that would have led reasonable counsel to investigate further. Counsel had visited Mr. Pye's family home and knew of its conditions of extreme poverty and neglect. *See Ferrell v. Hall*, 640 F.3d 1199, 1217, 1230 (11th Cir. 2011) (finding mitigating evidence that "[i]n an area where many people were poor, [the petitioner's family was] even worse off than others"). Had Mr. Mostiler explained to potential witnesses the mitigating value of the circumstances in which the Pye siblings were raised, he could have more fully investigated and developed that evidence. If he had, according to Ms. Bland's uncontroverted testimony, she would have revealed more to him, including the abuse Mr. Pye suffered.

39

Mr. Mostiler's shortcomings in the investigation of Mr. Pye's family background were compounded by his complete failure to attempt to rebut the case in aggravation that he knew was coming. Mr. Mostiler knew in advance that Mr. McBroom likely would argue to the jury that Mr. Pye would be dangerous if sentenced to life imprisonment. Mr. McBroom had a habit of making this argument in capital cases, and he and Mr. Mostiler were frequent opponents. Less than six months before Mr. Pye's trial, in a capital trial in which Mr. Mostiler represented the defendant, Mr. McBroom argued to the jury: "How do you explain [a sentence less than death] to the prison guard if he has to kill one to get out of jail? . . . He killed a defenseless woman, he wouldn't think twice about killing a guard to get out." Doc. 17-10 at 50. This is nearly word-for-word what Mr. McBroom argued to Mr. Pye's jury. Plus, Mr. McBroom had given the defense notice that it would introduce Mr. Pye's prior burglary conviction, providing Mr. Mostiler a peek at the State's strategy in aggravation *in this very case*.

Predictably, then, Mr. McBroom anticipated what Mr. Mostiler would say in his closing argument in Mr. Pye's trial, down to the very quotes Mr. Mostiler would employ. But Mr. Mostiler, knowing full well what Mr. McBroom likely would argue, never sought nor obtained DOC records, or witnesses who would testify, to show that Mr. Pye would not pose an escape risk or a threat to a guard—even though such records and witnesses existed. Indeed, Mr. Mostiler knew Mr.

40

McBroom had his hands on at least some of the records because of the notice that the prosecution would introduce the prior burglary conviction. As the Supreme Court has explained, counsel performs deficiently when he fails to make reasonable efforts to review evidence he knows the State will use in aggravation. *Rompilla*, 545 U.S. at 388–90.

Considering the paltry mitigation investigation Mr. Mostiler conducted, that he failed to pursue the leads he managed to uncover, and that he failed entirely to rebut the State's case in aggravation, we conclude that Mr. Mostiler performed deficiently in Mr. Pye's case.

## B. Prejudice

Having decided that counsel was deficient under a *de novo* review of the record, we turn to the prejudice prong of *Strickland*, first examining the state habeas court's conclusion that Mr. Pye failed to show prejudice through the lens of AEDPA deference and then conducting a *de novo* review.

### i. AEDPA Analysis

Just as with its analysis of *Strickland*'s deficient performance prong, the state habeas court's prejudice conclusion both involved unreasonable applications of well-established federal law and was based on unreasonable determinations of fact. As discussed above, in concluding that Mr. Pye failed to show prejudice stemming from counsel's performance, the state habeas court unreasonably

41

characterized as "misleading" several of the affidavits habeas counsel obtained, and so we do not defer to that determination or to the factual findings that underpin it.[13]

More globally, the state habeas court unreasonably discounted all the mitigation affidavits based on the proposition that they "'usually prove[] little of significance.'" Doc. 20-40 at 65 (quoting *Waters*, 46 F.3d at 1513–14). In context, the *Waters* quote states the unremarkable: that grants of federal habeas corpus are rare because we must avoid the distorting effects of hindsight. *Waters*, 46 F.3d at 1514 (citing *Strickland*, 466 U.S. at 689). The state habeas court, though, wielded the quote like a hammer, using it—along with the unreasonable fact-findings relating to three of the 24 affidavits—to discount the whole lot. This was unreasonable under *Strickland* and its progeny, which direct courts to consider evidence adduced during state postconviction proceedings and reweigh it, along with the evidence admitted at trial, against the evidence in aggravation. *See Wiggins*, 539 U.S. at 534.

---

[13] As we noted above, the state habeas court accurately noted that Mr. Lawson "corrected [his original testimony] through additional affidavit testimony." Doc. 20-40 at 65. In contrast to the three affidavits it found to be misleading, however, the state court made no factual findings about Mr. Lawson's testimony or credibility to which AEDPA deference would apply. The state court's blanket decision to assign little weight to Mr. Pye's affidavit testimony is not itself a fact-finding. Rather, "weighing the prosecution's case against the proposed witness testimony," as the state habeas court did here, "is at the heart of the ultimate question of the *Strickland* prejudice prong, and thus is a mixed question of law and fact not within the Section 2254(e)(1) presumption." *Ramonez v. Berghuis*, 490 F.3d 482, 491 (6th Cir. 2007).

The state habeas court also found "little, if any, connection" between Mr. Pye's impoverished background" and the crime he committed.  Doc. 20-40 at 66. Supreme Court law clearly establishes, however, that no such connection is required.  *See Williams*, 529 U.S. at 367–68, 395–98 (granting habeas relief despite lack of any nexus between petitioner's "nightmarish childhood" and the robbery and murder he committed); *cf. Tennard v. Dretke*, 542 U.S. 274, 287 (2004) ("[W]e cannot countenance the suggestion that low IQ evidence is not relevant mitigating evidence . . . unless the defendant also establishes a nexus to the crime.").  The state habeas court further found that because Mr. Pye "was 28 years old at the time of these crimes, trial counsel could have reasonably decided . . . that remorse was likely to play better than excuses."  Doc. 20-40 at 66.  The court's premise, that Mr. Pye's age meant evidence of his childhood and family background would not be mitigating, is patently unreasonable under the Supreme Court's decision in *Porter*, and its conclusion—that remorse was a reasonable tactic for counsel to pursue—has no support in the factual record of this case.

In *Porter*, the state court "discounted the evidence of Porter's abusive childhood because he was 54 years old at the time of the trial." *Porter*, 558 U.S. at 37.  The Supreme Court held that "[i]t is unreasonable to discount to irrelevance the evidence of Porter's abusive childhood, especially when that kind of history may have particular salience for a jury evaluating Porter's behavior in his

43

relationship with [his ex-girlfriend, the murder victim]." *Id.* at 43.  Here, just as in

*Porter*, evidence that Mr. Pye experienced abuse as a child could have been

particularly salient to the jury's evaluation of the crime he committed against a

former girlfriend.

As to the state habeas court's conclusion that Mr. Mostiler reasonably could

have pursued a strategy grounded in remorse, it is abundantly clear from the record

that Mr. Mostiler focused on remorse not at all.[14]  Mr. Pye's testimony in his own

defense at the guilt phase of the trial, in which he denied before the jury that he had

been present for the rape and murder, was utterly inconsistent with remorse.  At the

penalty phase, most of the defense witnesses stated their belief that Mr. Pye was

innocent—again, inconsistent with remorse.  Not surprisingly, Mr. Mostiler did not

even mention remorse in his closing argument; instead, he urged the jury to

exercise mercy.  Thus, the state habeas court's determination that remorse was a

reasonable defense strategy was unreasonable in light of the record, which

demonstrates that counsel could not have pursued a strategy based on remorse.[15]

---

[14] We recognize that the state habeas court's conclusion sounds more like a determination that trial counsel was not deficient than a conclusion as to prejudice.  We include it in our discussion here because the state court tied its remorse discussion to the premise, clearly grounded in a prejudice determination, that Mr. Pye's age decreased or eliminated the mitigating impact of his family background.  The court's finding relating to counsel's purported remorse strategy was unreasonable regardless of whether it related to deficient performance or prejudice.

[15] The State, for its part, argues that Mr. Mostiler reasonably pursued a mitigation strategy based on residual doubt.  But "in other cases where courts have accepted the efficacy of residual doubt defenses [to the death penalty], *actual* residual doubt was urged by defense

Finally, the state habeas court found no prejudice stemming from counsel's failure to rebut the State's future-dangerousness argument, reasoning that DOC records showed Mr. Pye was sometimes insubordinate. Doc. 20-40 at 60–61. The state habeas court failed to consider that it was not just evidence about Mr. Pye's carceral conduct in the DOC records, but also the mitigating evidence about Mr. Pye's mental health and intellectual functioning the records contained, that could have swayed the jury. The court's failure to consider the full breadth of mitigating evidence in the DOC records was contrary to *Rompilla*, in which the Supreme Court ruled that "[i]f the defense lawyers had looked in the file on Rompilla's prior conviction, it is uncontested that they would have found a range of mitigation leads that no other source had opened up," including a picture of their client's mental health that was "different[] from anything defense counsel had seen or heard." *Rompilla*, 545 U.S. at 390.

The state habeas court unreasonably cast aside Mr. Pye's mitigation affidavits, required a temporal and topical connection between the crime and

---

counsel." *Ferrell*, 640 F.3d at 1232. Here, Mr. Mostiler did not urge the jury to vote for a sentence other than death on a theory of residual doubt. Instead, "counsel's argument can be more accurately described as evincing a 'mercy-despite-guilt-strategy—asking the jury to spare [Mr. Pye's] life, even if he did it." *Id.* Importantly, aside from the lack of evidence that Mr. Mostiler adopted a residual-doubt strategy, the state habeas court opined that counsel acted reasonably in highlighting remorse, not residual doubt. *See Wilson*, 138 S. Ct. at 1191–92 (requiring us "to train [our] attention on *the particular reasons*" the state habeas court gave in adjudicating a claim and defer to those reasons (emphasis added) (internal quotation mark omitted)).

45

mitigating circumstances, buoyed trial counsel's performance based on a nonexistent remorse strategy, and failed to consider the full breadth of mitigating evidence in Mr. Pye's DOC records. The court's errors lie "beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Thus, the state habeas court's prejudice decision involved an unreasonable application of federal law and was based on unreasonable determination of fact. *Id.*; *see Wilson*, 138 S. Ct. at 1191–92.

### ii.    *De Novo* **Review**

Here, as with *Strickland*'s deficient performance prong, we are unconstrained by the deference afforded by § 2254 and now conduct a *de novo* review. The question we must answer in conducting a *de novo* review "is whether the entire postconviction record, viewed as a whole and cumulative of mitigation evidence presented originally, raised a reasonable probability that the result of the sentencing proceeding would have been different if competent counsel had presented and explained the significance of all the available evidence." *Debruce v. Comm'r, Ala. Dep't of Corr.*, 758 F.3d 1263, 1275 (11th Cir. 2014) (internal quotation marks omitted). Habeas counsel compiled evidence of severe physical abuse, neglect and endangerment, low intellectual functioning, depression, and extreme poverty—evidence that "paints a vastly different picture of [Mr. Pye's] background" than the evidence presented at the penalty-phase hearing. *Id.* at 1276;

46

*see also Wiggins*, 539 U.S. at 535.  "[H]ad the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence."  *Wiggins*, 539 U.S. at 536.

The mitigating evidence habeas counsel adduced "is consistent, unwavering, compelling, and wholly unrebutted."  *Ferrell*, 640 F.3d at 1234.  It is precisely the kind of mitigating evidence the Supreme Court and this Court have held demonstrates prejudice.  Mr. Pye was raised in abject poverty by parents who managed to feed and clothe their 10 children by the slimmest of margins.  *See Rompilla*, 545 U.S. at 390.  The family lived in a house that had no indoor plumbing or central heating, and the children did not have functional clothing.  *Id.* at 392.  Whether to go to work or out drinking (Lolla Mae drank even while pregnant), Mr. Pye's mother left him alone with his siblings all day, leaving the older children—10, at the oldest—to care for the younger ones.  *See Wiggins*, 539 U.S. at 516–17 ("[P]etitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days.").  A school social worker found the conditions of the Pye home so deplorable that he reported the family to DFACS, which did nothing.

Experts and lay witnesses unanimously agree that Mr. Pye is of low intellectual functioning, bordering on intellectual disability.  He "attended classes for slow learners and left school when he was 12 or 13."  *Porter*, 558 U.S. at 33–

47

34; *see also Williams*, 529 U.S. at 396 ("Counsel failed to introduce available evidence that Williams was 'borderline [intellectually disabled]' and did not advance beyond sixth grade in school."). He was teased at school for his academic challenges and for his tattered clothing. He often did not make it onto the school bus because his house was too cold to get out of bed.

Mr. Pye's father, a violent and explosive alcoholic, regularly abused his children and his wife. In fact, the record shows that Buck Pye had virtually no other meaningful interactions with his children. "[B]y his siblings' account, [Mr. Pye] was his father's favorite target, particularly when [Mr. Pye] tried to protect his mother." *Porter*, 558 U.S. at 33; *see also Ferrell*, 640 F.3d at 1234 (explaining that the petitioner was "especially" targeted for abuse by his father). Buck Pye told his son he "was so stupid that he just couldn't be [Buck's] kid" and would tell the other children to ignore him. Doc. 16-24 at 26; Doc. 16-25 at 2. Mr. Pye also "routinely witnessed his father beat his mother," *Porter*, 558 U.S. at 33, at least once so severely that she required medical treatment, despite the family's inability to pay for medical care and resulting inclination not to seek it. *See Rompilla*, 545 U.S. at 392 (listing as a mitigating circumstance that the petitioner's "father, who had a vicious temper, frequently beat Rompilla's mother, leaving her bruised and black-eyed"). "His parents fought violently," and on at least one occasion his

48

mother attacked his father with a knife. His mother also beat the children. In time, his older siblings began to join in the violent domestic abuse.

Mr. Pye's depression was evident from an early age. His siblings recall his hiding from the family violence, curling up and staring into space. He would not speak in those moments. By the time he was incarcerated on a burglary charge, psychologists considered him to be severely depressed and in need of psychopharmacological treatment. The prison was a brutal environment where, even by accounts of the guards, new prisoners could expect to be physically or sexually assaulted, or both. The guards considered Mr. Pye, who was small in stature, to be a target. The prison's psychologist agreed, calling Mr. Pye "very weak" and suggesting that he may need protective custody. *See Wiggins*, 539 U.S. at 517. Despite the violence of the prison environment, prison guards and officials did not consider Mr. Pye to present an escape or violence threat. *See Williams*, 529 U.S. at 396.

The jury heard virtually none of this powerful mitigating evidence. Instead, the jury heard little more than "naked pleas for mercy." *Rompilla*, 545 U.S. at 393. Worse, what the jury did hear about Mr. Pye was at best misleading. Unprepared to testify, Ms. Bland told the jury that Mr. Pye was raised in a "four-bedroom" house, not one in deplorable condition with makeshift sleeping quarters divided by boards and sheets. Ms. Starks, also unprepared to testify, acknowledged that the

family lacked running water and central heating, but followed up her description of what the family did not have with what it supposedly did have—love. Further misleading the jury about the supposedly loving upbringing Mr. Pye experienced, Mr. Pye's primary abuser, his father, testified without mentioning the trauma he caused his son. No other family member who testified at trial mentioned it either. To top it off, the jury heard from the prosecution that, if given the opportunity, Mr. Pye would kill a prison guard to escape without hearing any of the available evidence that he posed no serious risk to anyone in prison.

Of course, in assessing prejudice we must reweigh the evidence in mitigation against the evidence in aggravation, including evidence the State would have introduced to rebut the defense's new mitigating evidence. *Wiggins*, 539 U.S. at 534. There is no doubt that this was an aggravated crime. Mr. Pye and his companions kidnapped and raped Ms. Yarbrough at gunpoint, and then Mr. Pye shot her multiple times when she was lying on a roadside. The State presented compelling evidence that Mr. Pye had been violent with Ms. Yarbrough before and that on this night she remained alive for 10 to 30 minutes after he shot her, was conscious for most that time, and attempted to stand or crawl to safety. Mr. Pye's conduct resulted in the imposition of four statutory aggravating circumstances. But the Supreme Court and this Court have found prejudice in very aggravated cases. *See, e.g.*, *id.* at 514–15, 535 (finding prejudice even though defendant

robbed and drowned an elderly woman); *Ferrell*, 640 F.3d at 1204–05, 1234–36 (finding prejudice even though defendant robbed and murdered, execution-style, his elderly grandmother and young cousin). Moreover, the extreme domestic violence Mr. Pye experienced—in part because his father, imprisoned around the time of his conception and birth, questioned his parentage—would have contextualized some of the circumstances of the undeniably horrific crime Mr. Pye committed. *See Ferrell*, 640 F.3d at 1235; *see also* O.C.G.A. § 17-10-30(b) (requiring the judge to instruct the jury that it can consider "any mitigating circumstances").

Undoubtedly, had Mr. Mostiler introduced evidence that Mr. Pye posed no serious threat while incarcerated and had trusting, congenial relationships with guards, the State would have introduced evidence that while serving his time for burglary Mr. Pye was investigated twice for assaulting a fellow prisoner. Doc. 15-19 at 51. Here on appeal the State points to these alleged infractions.[16] A close reading of the disciplinary reports does little to bolster the State's argument, however.

---

[16] The state habeas court noted in passing that Mr. Pye had at least twice assaulted a guard while incarcerated on death row. These incidents, which resulted in no injuries and minimal use of force, occurred after sentencing and so would not have been available to Mr. McBroom. Even considering them now, the incidents do not change our rationale or result because their aggravating nature pales in comparison to the mitigating value of information the DOC records contained.

In the first incident, the investigating officer found that "horse-playing led to fighting" with a fellow prisoner and, after both prisoners "refused to stop when told," Mr. Pye "got smart mouthed" with an officer. *Id.* There were no injuries. Mr. Pye pled guilty to the disciplinary committee. In the second incident, Mr. Pye was observed fighting with another prisoner, and an officer "only held inmate Willie Pye back away from [the other] inmate to keep the inmates separated," while another officer restrained the other man. Doc. 15-20 at 8. During the investigation, Mr. Pye took responsibility, and the disciplinary committee found him *not guilty* of assault. We do not find convincing the State's argument that the aggravating nature of these documents would blunt the mitigating value of the evidence and leads they contained.

What is more, this is not a case where the type of mitigating evidence adduced during the state habeas proceedings would have undermined counsel's strategy at sentencing. Mr. Mostiler focused his penalty-phase presentation on mercy; mitigating evidence of the type habeas counsel uncovered "would have easily and directly supported the approach counsel offered at sentencing." *Ferrell*, 640 F.3d at 1235. To the contrary, with scant details from poorly prepared witnesses, counsel's focus had the weakest of evidentiary support, and the State's argument in closing was made even more powerful. *See id.* at 1236 (finding prejudice, despite numerous strong aggravators, when "the testimony from

52

witnesses at the penalty phase . . . actually was very sparse"). When the prosecution asked the jury, "If Willie James Pye does not deserve the death penalty, who are you saving it for?," Doc. 13-11 at 90, the jury knew almost nothing about Mr. Pye. Thus, "[t]he jury labored under a profoundly misleading picture of [Mr. Pye's] moral culpability"—exacerbated by the State's strategy of suggesting future dangerousness—"because the most important mitigating circumstances were completely withheld from it." *Ferrell*, 640 F.3d at 1236.

The evidence trial counsel failed to investigate and present "adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury." *Rompilla*, 545 U.S. at 393. It "is possible that a jury could have heard it all and still have decided on the death penalty," but "that is not the test." *Id.* The "mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [Mr. Pye's] moral culpability." *Wiggins*, 539 U.S. at 538 (internal quotation marks omitted). Because he has shown "a reasonable probability that at least one juror would have struck a different balance" between life and death, Mr. Pye has shown prejudice under *Strickland*. *Id.* at 537. He is entitled to a new penalty phase.

## IV.    CONCLUSION

"[I]t will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal

53

habeas proceeding.  This is one of those rare cases." *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 911 (11th Cir. 2011).  The district court's denial of Mr. Pye's petition for a writ of habeas corpus is reversed in part.  We remand to the district court for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, REMANDED.**